Argued and submitted January 13, decision of Court of Appeals affirmed; finding of juvenile court of jurisdiction on ground that youth engaged in conduct that, if committed by an adult, would constitute first-degree sodomy reversed; finding of juvenile court of jurisdiction on other grounds affirmed, and case remanded to juvenile court for further proceedings August 13, 2009

In the Matter of S. P.,
a Youth.

STATE ex rel JUVENILE DEPARTMENT
OF MULTNOMAH COUNTY,
*Petitioner on Review,*

*v.*

S. P.,
*Respondent on Review.*

(CC 2004812301; CA A129435; SC S056089)

215 P3d 847

Janet A. Metcalf, Assistant Attorney General, Salem, argued the cause and filed the brief for petitioner on review. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Rebecca Duncan, Assistant Chief Defender, Salem, argued the cause and filed the brief for respondent on review. With her on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

DURHAM, J.

## DURHAM, J.

■ This juvenile court delinquency proceeding comes before us on a question of federal constitutional law. In *Crawford v. Washington*, 541 US 36, 124 S Ct 1354, 158 L Ed 2d 177 (2004), the United States Supreme Court held that the Sixth Amendment to the United States Constitution forbids the admission of testimonial hearsay in a criminal trial, unless the declarant is unavailable and the defendant has had a prior opportunity to cross-examine.[1] *See also Melendez-Diaz v. Massachusetts*, 557 US ____ , 129 S Ct 2527, 174 L Ed 3d 314 (2009) (applying *Crawford*). In this case, we are asked to determine whether hearsay statements, made by a three-year-old victim of sexual abuse to staff members at the CARES Northwest[2] program, are "testimonial." The Court of Appeals determined that such statements are testimonial, and held that the juvenile court erred in admitting them at youth's hearing to determine the court's jurisdiction. *State ex rel Juv. Dept. v. S. P.*, 218 Or App 131, 178 P3d 318 (2008). We review that decision for errors of law. ORS 19.415(4).[3] For the following reasons, we affirm the decision of the Court of Appeals.

## I. FACTS

On June 10, 2004, the victim, N, visited the home of his paternal grandparents. Youth, an acquaintance of the family, also was present. At some point that day, youth and N

---

[1] The Confrontation Clause of the Sixth Amendment applies to delinquency proceedings in a state's juvenile court. *In re Gault*, 387 US 1, 56-57, 87 S Ct 1428, 18 L Ed 2d 527 (1967). *See also Carey v. Population Services International*, 431 US 678, 692 n 14, 97 S Ct 2010, 52 L Ed 2d 675 (1977) (confirming right of minors to "the rights to notice, counsel, confrontation, and cross-examination, and not to incriminate oneself, * * *" citing *Gault*). The parties in this case have proceeded on the assumption that youth is entitled to the protection of the right of confrontation under Article I, section 11, of the Oregon Constitution, and we adopt the same assumption.

[2] CARES is an acronym for "Child Abuse Response Services," according to witness Dr. Heiferman. The Court of Appeals described an earlier meaning of the acronym as "Child Abuse Response and Evaluation Services." *State ex rel Juv. Dept. v. S. P.*, 218 Or App 131, 133 n 1, 178 P3d 318 (2008).

[3] ORS 19.415 provides, in part:

"(4) When the Court of Appeals has tried a cause anew upon the record, the Supreme Court may limit its review of the decision of the Court of Appeals to questions of law."

were alone together in a bedroom, watching television, while the adults were in another room. That evening at home, N stated to his parents, without prompting, "I don't want to bite [youth's] penis." N's parents asked N to repeat what he had said, and N repeated that he did not want to bite youth's penis. N also stated that youth had touched his penis. When N's father asked if anything else had happened, N put his hand down the front of his diaper and touched his penis.

That evening, N's father called the Department of Human Services (DHS). DHS instructed N's father to take N to a pediatrician for a referral to CARES. The following day, N's mother took N to his regular pediatrician. During that visit, N did not make any statements about being touched. The pediatrician advised N's mother to schedule an evaluation with CARES.

N's mother contacted CARES and reported what had happened to an intake worker. The intake worker also spoke with a DHS representative, McCarthy, who faxed a report to CARES describing the earlier report from N's father. McCarthy also stated that she would cross-report the matter to the Multnomah County Child Abuse Team. CARES staff discussed the case and determined that because N "was not talked to in the context of the exam and because DHS needs clarification of the allegations," it was appropriate to schedule an evaluation of N. The intake worker then contacted N's mother and scheduled an evaluation for that same day. The worker also called DHS to confirm that McCarthy would attend the evaluation.

The evaluation team consisted of Heiferman, a pediatrician, and Findlay, a social worker. McCarthy and another DHS worker attended, but were unable to stay for the entire evaluation. A Clackamas County Sheriff's Deputy, Krummenacker, also attended the evaluation "as a courtesy to the Portland Police Bureau." N's mother filled out a written questionnaire and answered several questions regarding N's medical and personal history. Krummenacker was not in the room with N's mother during that part of the evaluation, but observed it through a one-way mirror.

Heiferman and Findlay then conducted an examination and interview with N, without his mother present.

Again, Krummenacker was not in the room, but was able to monitor the evaluation by microphone. Heiferman conducted a physical examination of N and found nothing abnormal. She then conducted what she called a "body review," which consisted of a series of questions to N. Heiferman asked N if anyone had hurt various parts of his body, such as his head, eye, neck, or belly. N answered "no" to each question. She asked if anyone had touched his penis or his buttocks, and again, he answered "no." She asked if his mom was worried about him, and he answered "no." She asked if there was anyone that he was afraid of, and he said, "No. I got a jellyfish at home." N continued to respond "no" to various questions about his home and friends.

At that point, Heiferman and Findlay became concerned that N was giving what they referred to as a "patterned response," meaning that N was giving the same answer to the questions without understanding them. Findlay then told N that N's mother was worried that someone had touched his penis, and asked N if anyone had done that. N responded that youth "already did" and that youth "was trying to suck it." When Findlay asked what youth tried to suck it with, N responded, "His mouth." Findlay asked if youth had sucked it, and N said "yes." N also made repetitive grabbing motions to his crotch and indicated that youth had grabbed it. At that point, N said that he wanted to see his mother, and Findlay ended the interview.

Heiferman and Findlay then met to review their findings and discuss treatment recommendations. They were joined by Krummenacker and by Smith, another social worker. Heiferman's diagnosis was "highly concerned for sexual abuse." The evaluation team recommended no further contact between N and youth, and advised that N's parents monitor his behavior, but did not recommend therapy. The team also recommended "further investigation by DHS and law enforcement into these allegations of abuse." The team then provided N's mother with a summary of the evaluation. Deputy Krummenacker did not participate in making treatment recommendations, but did meet with N's mother "to discuss the ongoing investigation."

Subsequently, detectives assigned to the Multnomah County Child Abuse Team interviewed youth. CARES had provided the detectives with a copy of the CARES evaluation report, and the detectives referred to it during the interview. Youth initially denied any sexual contact with N, but ultimately admitted to touching and sucking on N's penis.

The state filed a petition in juvenile court, alleging that youth had committed acts that, if performed by an adult, would constitute first-degree sodomy and first-degree sexual abuse. The case proceeded to trial and the parties stipulated that N lacked competency as a witness and, for that reason, would be unavailable to testify. The state announced its intent to offer into evidence the statements that N had made during his evaluation at CARES, and statements that he had made to his parents. Youth objected, arguing that both groups of statements were inadmissible under the Oregon Evidence Code, and that admission of the statements to CARES would violate the Confrontation Clause of the Sixth Amendment, as interpreted in *Crawford*.

The juvenile court ruled that all of N's statements were admissible under the Oregon Evidence Code. The court further held that the bulk of N's statements to CARES was not barred from evidence by *Crawford*, because they were not testimonial statements; as an exception, however, the court determined that N's identification of youth as the perpetrator was a testimonial statement. After the presentation of evidence, the court found that youth was within its jurisdiction for acts that, if committed by an adult, would constitute first-degree sodomy and first-degree sexual abuse.

Youth appealed, arguing that the juvenile court had erred in admitting the statements described above. First, youth argued that N's statements to his parents and to CARES were hearsay and not admissible under the exception for statements concerning acts of abuse, OEC 803(18a)(b). Specifically, youth argued that, under *State v. Campbell*, 299 Or 633, 705 P2d 694 (1985), the trial court erred by accepting the parties' stipulation that N was unavailable as a witness, rather than making an independent determination as to N's unavailability. Second, youth argued that N's statements to CARES were inadmissible under the hearsay exception for

statements for purposes of medical diagnosis and treatment, provided at OEC 803(4). Finally, youth renewed his argument that N's statements were "testimonial" under the Sixth Amendment and, as such, were not admissible because youth had not had a prior opportunity to cross-examine N.

The Court of Appeals held that youth's arguments based on OEC 803(18a)(b) and *Campbell* were unpreserved and declined to review them as error apparent on the face of the record. Because the Court of Appeals upheld the juvenile court's ruling that N's statements were admissible under OEC 803(18a)(b) and *Campbell*, youth's argument regarding OEC 803(4) was of no consequence. However, the Court of Appeals then held that youth's statements to the CARES representative were testimonial, and thus inadmissible under the Confrontation Clause of the Sixth Amendment. The court determined that, under *Davis v. Washington*, 547 US 813, 126 S Ct 2266, 165 L Ed 2d 224 (2006), "the purpose of the questioner in eliciting statements is a key focus of the inquiry" as to whether a statement is testimonial. *S. P.*, 218 Or App at 145. However, the court went on to observe that, when an interview serves more than one purpose, "the nature and extent of police or prosecutorial involvement in that process is a very substantial—indeed, potentially decisive—consideration" as to what that purpose was. *Id.* at 149. Likewise, under certain circumstances, the declarant's reasons for making a statement also could be relevant to the question of whether a statement is testimonial. *Id.* at 145.

The court then examined both the interview in this case and the CARES program in general, and determined that the interview served two purposes: to obtain information for a medical diagnosis of abuse, and to preserve an accurate account of that abuse for possible future prosecutions. Those two purposes were "concurrent and coequal; both are 'primary' in the sense that neither takes precedence over the other." *Id.* at 154. Because a primary purpose of the interview was to "establish or prove past events potentially relevant to later criminal prosecution," the Court of Appeals determined that N's statements during that interview were testimonial. *Id.* at 154-55 (quoting *Davis*, 547 US at 822). Likewise, the court determined that N's purpose in making his statements was immaterial, "[p]utting aside the difficulties of assessing

the mind of a three-year-old (much less one stipulated to be unavailable to testify at the juvenile hearing six months later 'by reason of competency') * * *." *Id.* at 155.

Accordingly, the Court of Appeals determined that the juvenile court erred by admitting N's statements to CARES into evidence. The Court of Appeals then vacated the juvenile court's finding of jurisdiction based on conduct that, if committed by an adult, would constitute first-degree sodomy. *Id.* at 158. However, the Court of Appeals affirmed the juvenile court's finding of jurisdiction based on conduct that, if committed by an adult, would constitute first-degree sexual abuse; the Court of Appeals determined that other evidence established that basis for jurisdiction beyond a reasonable doubt. *Id.* at 157.

The state seeks review of the decision of the Court of Appeals, advancing three primary arguments for reversal. First, the state argues that only statements made to police officers and government officials are "testimonial" under *Crawford* and *Davis*. Because N made the statements at issue to a pediatrician and a social worker, the state asserts that his statements were not testimonial. Second, the state argues that statements made during an interview are testimonial only if the "primary purpose" of the interview is to establish past events relevant to criminal prosecution. In the instant case, the state asserts that N's statements were not testimonial, because the primary purpose of his interview at CARES was to diagnose sexual abuse and make treatment recommendations. Third, the state argues that whether a statement is testimonial depends on the purpose of the *declarant*, not the questioner. The state asserts that there is "nothing to suggest" that N's purpose "was anything other than to undergo a medical examination and to answer the questions first put by the doctor and then by the social worker."

Youth responds that N's statements were testimonial, because they were formal statements made to persons conducting interviews about potentially criminal past conduct in coordination with the police. Youth asserts that neither the declarant's intent nor the questioner's is dispositive

as to whether a statement is testimonial. Rather, "the fundamental question is whether the statement is a formal assertion of historical fact."

## II. DISCUSSION

### A. *Issues of Oregon Law*

■ On review, the parties focus their arguments on the Confrontation Clause of the Sixth Amendment. However, we will address arguments based on the laws of our state before reaching a claim that those laws fall short of a federal constitutional requirement. Otherwise, we risk "wast[ing] a good deal of time and effort of several courts and counsel and needlessly spur[ring] pronouncements by the United States Supreme Court on constitutional issues of national importance in a case to whose decision these may be irrelevant." *State v. Kennedy*, 295 Or 260, 264-65, 666 P2d 1316 (1983). We will not allow parties, by the manner in which they frame the issues on review, to "force the court into a position to decide that the state's government has fallen below a nationwide constitutional standard, when in fact the state's law, when properly invoked, meets or exceeds that standard." *Id.* at 266-67.

Accordingly, we begin by addressing youth's argument that N's statements to CARES constituted inadmissible hearsay, and that those statements were not admissible under OEC 803(18a)(b) and *Campbell*. The thrust of youth's argument is that, under *Campbell*, the trial court was obligated to make an independent determination that N was unavailable as a witness, rather than accepting youth's own stipulation to that fact.[4]

*Campbell* presented a set of facts similar to those at issue here. Before the defendant's trial for first-degree sodomy, the defendant and the state stipulated that the three-year-old-victim lacked competency to testify as a witness. The state then introduced hearsay statements that the victim had made to her mother, implicating the defendant. On

---

[4] Youth cites OEC 803(18a)(b), but bases his appellate argument almost entirely on *Campbell*, and does not explain how OEC 803(18a)(b) would result in the exclusion of N's statements to CARES. Accordingly, we do not separately analyze that rule.

review, this court held that those statements were admissible under the existing version of OEC 803(18a), as "complaints of sexual misconduct." *Campbell*, 299 Or at 646.

The defendant then argued that admission of the child's statements violated his right to confrontation under Article I, section 11, of the Oregon Constitution. To analyze that question, this court adopted the since-rejected reasoning of the United States Supreme Court in *Ohio v. Roberts*, 448 US 56, 100 S Ct 2531, 65 L Ed 2d 597 (1980):

> "In *Ohio v. Roberts, supra*, the United States Supreme Court established a two-part test for determining whether admission of out-of-court statements of a witness who does not testify at trial satisfies the defendant's right to confrontation. First, the declarant must be unavailable and, second, the declarant's out-of-court statements must have 'adequate indicia of reliability.' Justice [Blackmun] stated with apparent concurrence of the entire court that '[r]eliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception.' He added that in other cases the evidence 'must be excluded, at least absent a showing of particularized guarantees of trustworthiness.' "

*Campbell*, 299 Or at 648 (citing *Roberts*, 448 US at 66).[5] Using that test, this court determined that complaints of sexual misconduct fell within an "ancient and firmly rooted hearsay exception," and, therefore, had adequate indicia of reliability. *Id.* at 650.

That left the question of whether the declarant was "unavailable." As mentioned above, the parties had stipulated to the fact that the victim was incompetent to testify. The defendant, however, insisted that he had not stipulated to the victim's *unavailability*, and accordingly, he had not waived any right to confront her. This court determined that the defendant's stipulation had no effect, because it was the trial court's responsibility to ensure that the witness was unavailable:

---

[5] In *Melendez-Diaz*, the United States Supreme Court describes *Ohio v. Roberts* as resting on a "since-rejected theory that unconfronted testimony was admissible as long as it bore indicia of reliability * * *." 557 US at ___, 129 S Ct at 2533.

> "We believe that the question of unavailability of a hearsay declarant supposedly due to incompetency should not be left to the advocates in a criminal trial. The prosecution would be relieved from calling the witness and the defense relieved from having the witness appear for trial. If the court is going to admit hearsay statements against a defendant to satisfy the confrontation rights of an accused, the court must ensure the declarant is in fact unavailable.

> "* * * * *

> "We hold, therefore, that before any out-of-court declaration of any available living witness may be offered against a defendant in a criminal trial, the witness must be produced and declared incompetent by the court to satisfy either Article I, section 11, of the Oregon Constitution, or the Sixth Amendment to the United States Constitution. This ruling on competency was not undertaken in this case and, therefore, the case must be reversed and remanded to the trial court for such a determination."

*Id.* at 651-52 (footnote omitted).

■ In this case, youth argued to the Court of Appeals that, even though he had stipulated to N's unavailability as a witness in the juvenile court, *Campbell* required the juvenile court to evaluate N and determine whether he was competent to testify. Youth insisted that, because the juvenile court had failed to do so, the Court of Appeals had to remand the case for a new trial.

■ The state responded that, for a variety of reasons, youth failed to preserve that argument and that it was not reviewable as error apparent on the face of the record. The Court of Appeals came to a similar conclusion. First, the Court of Appeals stated that youth's argument primarily relied on OEC 803(18a)(b), rather than on the Confrontation Clause of Article I, section 11, as the argument in *Campbell* had. The court also noted that *Campbell* did not address the question of whether the defendant had preserved or invited the trial court's error. Finally, the court observed that subsequent decisions of this court appeared to contradict an implicit premise of *Campbell* in holding that "criminal defendants routinely waive trial-related constitutional rights for a variety of tactical and strategic reasons." *S. P.*, 218 Or App at

140-41. For those reasons, the court concluded that the juvenile court had not made an error that was apparent on the face of the record, because the proper application of *Campbell* was not "obvious" and was "reasonably in dispute." Furthermore, the court held, in light of the "manifest potential" that youth had made a strategic decision to stipulate to N's unavailability, the court held that it would not exercise discretion to review such a claim of error. *Id.* at 142.[6]

The state's argument requires that we examine *Campbell* to determine whether the court reached a holding—that is, a legal determination that carries precedential effect—on the question whether a party asserting on appeal a violation of the state and federal confrontation clauses must have preserved that argument below. *Campbell* held that the state and federal confrontation clauses required a trial court, before admitting out-of-court declarations of any potentially available living witness in a criminal trial, to examine the witness and declare the witness incompetent and, therefore, unavailable. *Campbell* also held that the trial court was bound by that requirement *even though the defendant had stipulated to the incompetence of the witness.* The court reasoned that reversal was necessary solely because the trial court had not determined whether, on the basis of an examination by the trial court, the witness was incompetent to testify:

> "This ruling on competency was not undertaken in this case and, therefore, the case must be reversed and remanded to the trial court for such a determination."

*Id.* at 652.

It is clear that, in *Campbell*, this court provided guidance to trial courts regarding the correct administration of the confrontation right. It is equally clear that *Campbell* does not address expressly the question whether a party asserting on appeal that a trial court failed to follow the

---

[6] An appellate court will not review an unpreserved claim of error unless the error (1) is an error "of law," (2) is "apparent," meaning that it is obvious or not reasonably in dispute, and (3) appears "on the face of the record." *Ailes v. Portland Meadows, Inc.*, 312 Or 376, 381-82, 823 P2d 956 (1991). Even if an error meets those criteria, the decision to review the error remains in the discretion of the appellate court. *Id.* at 382.

directives in *Campbell* first must demonstrate that the claim of error was preserved in the trial court. The *Campbell* court's disposition—reversing and remanding the case for a trial court determination on witness competency notwithstanding the parties' stipulation that the witness lacked competency—creates an implication that the court did not require preservation of the asserted error. But, despite that permissible inference, we are reluctant to ascribe the precedential effect of a holding to what is at most an ambiguity that the *Campbell* opinion does not address or otherwise resolve. Instead, in our view, the state's objection to youth's failure to preserve the question below, and youth's response that *Campbell* describes trial court obligations that require no demand or objection by youth, together pose an open question to this court.

■ This court will determine, *sua sponte*, whether the issues before it were preserved at trial. *See State v. Wyatt*, 331 Or 335, 345-47, 15 P3d 22 (2000) (holding that the Court of Appeals should not have considered an unpreserved claim of error, even though the parties had stipulated that the claim was preserved). We take on that responsibility to serve two policy goals. First, the preservation requirement is important to judicial efficiency. If a party objects to an action or decision of the trial court, the party must "permit the trial judge a chance to consider the legal contention or to correct an error already made." *Shields v. Campbell*, 277 Or 71, 77, 559 P2d 1275 (1977). Second, the preservation requirement promotes fairness to the adversary parties. *State v. Hitz*, 307 Or 183, 188, 766 P2d 373 (1988).

Ignoring the preservation of error requirement in this context, in our view, would frustrate both of those goals. Youth did not notify the trial court, through an objection or otherwise, that, in his view, the court's administration of his confrontation right, including acceptance of the parties' stipulation, fell short of the requirements stated in *Campbell*. Likewise, youth did not alert the state regarding his claim that the trial court had to make an independent determination of N's competence until he filed his appellate brief. Had youth raised his objection in the trial court, it is likely that the state would have made a different record on the question.

Those facts support the Court of Appeals' view that the preservation principle applies to a claim on appeal that a trial court's administration of the confrontation right fell short of the requirements stated in *Campbell*.

Finally, we recently have held that, under other circumstances, a defendant may forfeit the right of confrontation by "affirmatively establishing" that a decision of the trial court is "not objectionable":

> "There is nothing unlawful about the admission of hearsay evidence, even in a criminal case where the constitution affords a right of confrontation. A lawyer's deliberate decision not to require that a witness testify in person at trial may benefit the defendant in many circumstances. For instance, an adverse declarant's testimony may have a more persuasive effect in person than it would when relayed by a third party. Or, a defendant may not contest the testimony of the declarant, and, in that circumstance, defense counsel may wish to avoid the time and attention that in-person testimony would entail. When the record discloses, as it does here, that a lawyer for a defendant has made an explicit decision not to make an evidentiary objection that otherwise could have been asserted, reviewing courts will not provide refuge from that deliberate choice on direct appeal."

*State v. Steen*, 346 Or 143, 155, 206 P3d 614 (2009) (footnote omitted). We cannot reconcile that passage from *Steen* with a rule that would allow a party, after making an "explicit decision" to stipulate to the incompetence of a witness at trial, to argue that the trial court's decision, in consequence of the stipulation, to declare that a witness lacks capacity and is unavailable as a witness is a basis for reversal on appeal.

■ In light of the foregoing, the Court of Appeals did not err in concluding that youth's *Campbell*-based objection was unpreserved. The Court of Appeals also concluded that youth's objection is not reviewable as error apparent on the face of the record. *See* ORAP 5.45(1), which provides, in part:

> "No matter claimed as error will be considered on appeal unless the claimed error was preserved in the lower court and is assigned as error in the opening brief in accordance with this rule, provided that the appellate court may consider an error of law apparent on the face of the record."

This court has determined that it will not exercise its discretion to review an asserted plain error if the party seeking review encouraged commission of the error in question or made a strategic choice not to object. *State v. Fults*, 343 Or 515, 523, 173 P3d 822 (2007). In *Clay/Luttrell v. Pay Less Drug Stores*, 276 Or 673, 677, 556 P2d 125 (1976), this court said that "invited error is not a basis for reversal." In view of those authorities, the Court of Appeals correctly declined to review youth's objection under *Campbell* as error apparent on the face of the record. To paraphrase *Steen*, youth made an explicit decision to stipulate to N's unavailability at trial, and he may not seek refuge from that deliberate choice on appeal.

To summarize, the trial court held that N's hearsay statements to both his parents and to CARES were admissible as statements concerning sexual abuse under OEC 803(18a)(b). Because youth failed to preserve his challenge to that ruling, we do not disturb it on review. Accordingly, we need not consider youth's alternative argument that N's statements to CARES were not admissible under OEC 803(4).[7]

As part of the "first things first" methodology, we also consider state constitutional issues before we consider federal claims. *Campbell*, 299 Or at 647. Here, however, *Campbell* forecloses any such claim. As mentioned earlier, *Campbell* held that under Article I, section 11, of the Oregon Constitution, a child's complaints about another's sexual misconduct have adequate indicia of reliability, because those complaints fall within an ancient and firmly rooted hearsay exception. *Id.* at 650-51. Such complaints are admissible at trial if the declarant is unavailable as a witness. *Id.* at 648. Youth stipulated to N's unavailability at trial, and is

---

[7] Youth appears to base his argument regarding the unavailability of the witness entirely on *Campbell*, and does not identify any statutory basis under OEC 803(18a)(b) for holding that the trial court was required to reject his stipulation to N's unavailability. Accordingly, we do not address any such argument. We note, however, that OEC 803(18a)(b) provides that a trial court "shall" examine a declarant in chambers to determine whether the declarant is unavailable, "unless otherwise agreed by the parties."

Youth *did* argue, before the Court of Appeals, that the juvenile court's findings concerning "indicia of reliability" under OEC 803(18a)(b) were insufficient. The Court of Appeals rejected that argument without discussion. On review, we do the same.

precluded from challenging that stipulation on appeal. Therefore, *Campbell* appears to allow for the admission of N's statements under Article I, section 11, and neither youth nor the state argues that *Campbell* was wrongly decided.[8] Accordingly, we turn to the question of whether the admission of N's statements violated the Confrontation Clause of the Sixth Amendment.

## B. *Issues of Federal Law*

The Sixth Amendment to the United States Constitution provides, in part:

> "In all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him * * *."

In *Crawford*, the United States Supreme Court held that the Sixth Amendment prohibits the admission of "testimonial" statements of witnesses absent from a criminal trial, unless the declarant is unavailable and the defendant has had a prior opportunity to cross-examine. 541 US at 59. The Court fashioned that holding in order to address the "principal evil" targeted by the Confrontation Clause, which was the "use of *ex parte* examinations as evidence against the accused." *Id.* at 50.

The Court did not offer a comprehensive definition of a "testimonial" statement, but it did offer suggestions as to the meaning of that term. The Court observed that "testimony" is "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Id.* at 51 (internal quotation marks omitted). A "formal statement to government officers" constitutes testimony, while a "casual remark

---

[8] As mentioned above, *Campbell* held that Article I, section 11, of the Oregon Constitution allows the admission of hearsay in a criminal trial when the declarant is unavailable and the declarant's statements have adequate indicia of reliability. That holding was based on the decision of the United States Supreme Court in *Roberts*. The Court of Appeals correctly has observed that "in *Crawford*, the United States Supreme Court abandoned the Confrontation Clause test from *Ohio v. Roberts* on which *Campbell* was predicated." *S. P.*, 218 Or App at 140. *See also* 346 Or at 601 n 5 (quoting *Melendez-Diaz*). Because neither party has raised the question, we do not determine, at this time, whether *Crawford* and *Melendez-Diaz* cast doubt on the continued validity of *Campbell*'s analysis of the Confrontation Clause of Article I, section 11. We point this out "so that our decision is not misunderstood to foreclose any potential issue of state law for the future." *Kennedy*, 295 Or at 268.

to an acquaintance" does not. *Id.* at 51. The Court then offered two examples of statements that would qualify as testimonial "under any definition": *ex parte* testimony at preliminary hearings, and statements taken by police officers in the course of interrogations. *Id.* at 52. The Court noted that such formal statements were testimonial whether they were taken by justices of the peace or police officers:

> "The involvement of government officers in the production of testimonial evidence presents the same risk, whether the officers are police or justices of the peace."

*Id.* at 53. *See also Melendez-Diaz*, 557 US at \_\_\_\_ , 129 S Ct at 2532 (applying *Crawford* in the context of laboratory analysts' affidavits confirming results of drug tests).

In *Davis v. Washington*, the Court offered an expanded discussion of what constitutes a "testimonial" statement. *Davis* consolidated two criminal cases, *Davis v. Washington* and *Hammond v. State*, which dealt with the admissibility of hearsay statements to a 9-1-1 operator and hearsay statements to police officers investigating a report of domestic disturbance.

The Court opened its analysis by offering the following definition of testimonial statements:

> "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution."

*Davis*, 547 US at 822. Although that definition focused on the purpose of an "interrogation," the Court emphasized that statements made in the absence of interrogation were not necessarily nontestimonial: "[I]t is in the final analysis the declarant's statements, not the interrogator's questions, that the Confrontation Clause requires us to evaluate." *Id.* at 822-23 n 1.

The Court then applied that analysis to the facts of the cases. The declarant in *Davis* had made her statements over the phone in response to a 9-1-1 operator's questions, stating that the defendant was "here jumpin' on me again" and that he had "just r[un] out the door." As a preliminary matter, the Court noted that "[i]f 9-1-1 operators are not themselves law enforcement officers, they may at least be agents of law enforcement when they conduct interrogations of 9-1-1 callers." For purposes of the opinion—and without ruling on the issue—the Court considered the acts of the 9-1-1 operator in *Davis* to be acts of the police. *Id.* at 823 n 2.

That said, four factors led the court to conclude that the declarant's statements to the 9-1-1 operator were not testimonial. First, the declarant was describing events "as they were actually happening," rather than events that had occurred in the past. Second, a reasonable listener would recognize that the declarant was "facing an ongoing emergency." Third, the statements elicited from the declarant were necessary to resolve a "present emergency," rather than "simply to learn * * * what had happened in the past." Finally, the declarant had not made her statements in a formal police interview: rather, they "were provided over the phone, in an environment that was not tranquil, or even * * * safe." *Id.* at 827 (emphasis removed). From those four factors, the Court concluded that the primary purpose of the declarant's interrogation by the 9-1-1 operator was to enable the police to deal with an ongoing emergency. The declarant's statements were not testimonial because she "simply was not acting as a *witness*; she was not *testifying*. * * * No 'witness' goes into court to proclaim an emergency and seek help." *Id.* at 828 (emphasis in original).

In contrast, the declarant in the companion case had made her statements to officers responding to a domestic disturbance call when there was no emergency in progress. The declarant's statements described "possibly criminal past conduct," after that conduct had occurred. There was no ongoing emergency; the interrogating officer "had heard no arguments or crashing and saw no one throw or break anything," and the declarant told the officers that there was "no immediate threat to her person." The officers' interrogation of the declarant was "formal" in that it took place in a separate

room, away from the defendant; the declarant "deliberately recounted, in response to police questioning, how potentially criminal past events began and progressed"; and the interrogation took place after the end of the events that the declarant was describing. *Id.* at 829-30. From those factors, the Court concluded that the declarant's statements were testimonial, because "they do precisely *what a witness does* on direct examination * * *." *Id.* at 830 (emphasis in original).

From those cases, we draw two preliminary conclusions regarding the arguments presented in this case. First, the Court has not stated, explicitly, whether a statement can be "testimonial" if it is made to anyone other than a judge or a law enforcement officer. However, the Court in *Davis* was willing to consider statements testimonial when the declarant made them to someone acting as an agent of a law enforcement organization, *e.g.*, a 9-1-1 operator.

Second, although *Davis* holds that the testimonial nature of a statement is determined by the "primary purpose of the interrogation," it also holds that "even when interrogation exists, it is in the final analysis the declarant's statements, not the interrogator's questions, that the Confrontation Clause requires us to evaluate." *Id.* at 822, 823 n 1. In other words, when the Court inquires into the primary purpose of an interrogation, it does not focus exclusively on the questions asked or the subjective intent behind them.[9] Rather, the Court infers the purpose of the interrogation by objectively examining the statements that the declarant makes and the circumstances under which the declarant makes them. The Court then determines whether those statements "do precisely *what a witness does* on direct examination," and whether the circumstances of the statements are similar to the *ex parte* examinations condemned in *Crawford*. *Id.* at 830. From that analysis, the Court infers the primary purpose of the interrogation in much the same way that, for

_____

[9] That is not to say that the questions asked, or the subjective intentions of the questioners, are not relevant to this inquiry. For example, the *Davis* Court noted in its analysis of the companion case that one of the officers "expressly acknowledged" that his questions were "part of an investigation into possibly criminal past conduct." *Davis*, 547 US at 829. Furthermore, any inquiry into the circumstances under which a declarant made a statement, by definition, would have to include consideration of questions to which the declarant was responding.

example, a jury might infer a defendant's intentions from the results of his actions.

Our cases have applied those principles. In *State v. Mack*, 337 Or 586, 101 P3d 349 (2004), we considered a factual scenario nearly identical to that presented in *Crawford*. Police attempted to interview a three-year-old child about an alleged murder that he had witnessed, but they could not establish a dialogue. A DHS caseworker assumed the primary role in questioning the child, while police videotaped the interview. This court held that the child's statements fell within the "core class" of statements that were testimonial under *Crawford*, because for all intents and purposes, they were made during police interrogation of a witness. *Id.* at 593.

*Mack* rejected a series of arguments similar to those that the state raises here. First, the state asserted that the child's statements to the caseworker were not testimonial, because the caseworker was not a police officer. This court responded that the caseworker was acting as an agent, or a proxy, for the police when she elicited the statements from the child. Second, the state asserted that the caseworker's interview of the child lacked the "formality" that characterizes testimonial evidence. This court responded that the DHS caseworker had structured the interview "in an age-appropriate way to elicit information from [the child] relevant to the police investigation," and that she had done so "at the request of the officers while they videotaped the interviews." For those reasons, this court concluded, the interview was not meaningfully different from the interrogations in *Crawford*. *Id.* at 594.

Finally, the state argued that whether or not the child's statements were testimonial was a question of the child's intent. This court responded that "the primary focus in *Crawford* was on the method by which government officials elicited out-of-court statements for use in criminal trials, not on the declarant's intent or purpose in making the statement."[10] This court acknowledged that in some situations, such as an unsolicited statement or an emergency call

---

[10] In *Crawford*, the United States Supreme Court noted that, in *White v. Illinois*, 502 US 346, 352-53, 112 S Ct 736, 116 L Ed 2d 848 (1992), the Court had

to a government official, a declarant's intent may be relevant. *Mack*, however, did not present such a scenario, and this court concluded that the child's statements to the DHS caseworker were testimonial. *Id.* at 594-95.

*State v. Camarena*, 344 Or 28, 176 P3d 380 (2008), dealt more directly with the question of what makes a statement "testimonial." The declarant, during a 9-1-1 call, stated that the defendant had assaulted her "[l]ike a minute" before the call. This court, as did the Court in *Davis*, assumed that the 9-1-1 operator acted as an agent of the police. *Id.* at 37. The Court of Appeals had held that the declarant's statements were not testimonial, because the 9-1-1 operator's questions were "calculated to determine whether an emergency existed and the nature and extent of [the declarant's] need for immediate assistance." *Id.* at 39-40 (quoting *State v. Camarena*, 208 Or App 575, 589, 145 P3d 267 (2006)) (internal quotation marks omitted). In other words, the Court of Appeals had attempted to follow the Supreme Court's directive to inquire into the "primary purpose of the interrogation" by focusing on the intentions behind the questions asked.

On review, this court rejected the analysis used by the Court of Appeals, emphasizing the Court's statement in *Davis* that the Confrontation Clause requires analysis of "the declarant's statements, not the interrogator's questions." *Id.* at 40 (quoting *Davis*, 547 US at 822-23 n 1). This court then applied the four factors listed in *Davis* to the facts of the case, and found that: (1) the lapse of time between the assault and the call was "insufficient to suggest that the danger of a renewed assault had fully abated"; (2) a reasonable person could infer "from [the declarant's] responses" that she faced an emergency; (3) the declarant's responses were necessary to help end that emergency; and (4) the environment from which the declarant was calling was not tranquil or safe. In short, an analysis of the declarant's statements, and the circumstances under which she made them, revealed that the primary purpose behind her 9-1-1 interrogation was to respond to an ongoing emergency. Accordingly, this court

---

considered but rejected a proposal to strictly confine the Confrontation Clause of the Sixth Amendment to testimonial statements. *Crawford*, 541 US at 61.

held that the declarant's initial 9-1-1 responses were nontestimonial, but the rest of her responses were testimonial, because they were not necessary to resolve that emergency. *Id.* at 40-41.

Thus, in *Mack* and *Camarena*, this court emphasized that whether a statement is testimonial depends on an objective analysis of the contents and circumstances of the statement, rather than an attempt to determine only the subjective intentions of the questioner or the declarant. We infer the purpose of an interrogation from the totality of the circumstances in which it took place and the results that it yielded.

C. *Application to the Instant Case*

With those legal principles in mind, we turn to our analysis of the facts of this case. We begin, as did the Court of Appeals, with a description of the CARES program. CARES provides a setting for the diagnosis of whether a child has been abused. The program is located in a medical office building across the street from Emanuel Hospital. The CARES office consists of a waiting room and a series of rooms used for examinations and interviews of children. The interview rooms are equipped with one-way mirrors; observers may watch interviews in secrecy from an adjacent viewing area. The examination rooms do not have one-way mirrors, but they are equipped with microphones in the ceiling that allow others to listen to statements and audible sounds occurring during an examination.

CARES personnel are trained to gather information from children. Heiferman testified that her training in that capacity is more than what a general pediatrician would have. Both Heiferman and Findlay testified that it is very common for law enforcement personnel to observe the staff gathering information from parents, and interviewing possible victims, by means of the one-way mirrors and microphones that are installed in the interview and examination rooms.

After an evaluation is complete, the CARES staff will make referrals to various treatment providers, based on the victim's needs. CARES itself does not provide treatment,

but provides the family of the victim with treatment recommendations. CARES also routinely will provide law enforcement with the results of its evaluations. In turn, law enforcement personnel will send possible abuse victims to CARES. Heiferman testified that approximately one-third of CARES clients are referred by law enforcement, and another third are referred by DHS.

Heiferman testified that the purpose of the CARES program is the diagnosis and treatment of child abuse. Findlay stated, more specifically, that one of the program's goals is to "centralize" the process of interviewing abused children:

"[O]ne of the primary goals of CARES is to sort of, I guess you could say, centralize the evaluation process when there is a concern of abuse, so that law enforcement and DHS, other sort of members of the community that are also going to be involved in the sort of the evaluation investigative process will be there present to hear firsthand what the child says, so if they have specific questions from what a child has said, they were there, they heard it.

"They may not have to, say, reinterview the child themselves."

When asked why it was important to minimize the number of interviews with a child, Findlay responded:

"Sometimes it's upsetting for a kid. Sometimes, you know, if a kid is—we like to minimize the number of interviews, too. If the kid is highly suggestible or has been asked a whole bunch of very leading questions or something like that. So that it will lessen the likelihood that the child's sort of statements are going to be contaminated."

Against that background, we examine the circumstances of N's evaluation by CARES. After N made his initial statement to his parents—"I don't want to bite [youth's] penis"—his father telephoned DHS, who directed him to take N to a pediatrician and obtain a referral to CARES. N's mother took N to a pediatrician, who also suggested an evaluation at CARES. When N's mother contacted CARES for an evaluation, the CARES intake worker contacted DHS. DHS, in turn, reported the matter to the Multnomah County Child Abuse Team. CARES staff discussed the case and decided to

schedule an evaluation of N because "DHS needs clarification of the allegations."

As noted above, Heiferman and Findlay took N's history from his mother and conducted their examination of N, while Deputy Krummenacker observed from another room. The deputy was present for N's treatment recommendations, but did not participate. Afterwards, however, the deputy met with N's mother to "discuss the ongoing investigation." CARES provided a comprehensive written report of its findings to the lead detective in N's case, who reviewed that report before speaking with youth, and used statements from that report to contradict youth when youth denied abusing N.

From those facts, the Court of Appeals drew two factual conclusions. First, the court observed that the CARES interview process "serves multiple concurrent purposes." One of those purposes is to determine whether a child has, in fact, been sexually abused, in order to provide effective medical and psychological treatment for the child. However, CARES also enables police and child welfare authorities to obtain credible evidence of abuse by minimizing the number of interviews of a child victim, thus limiting the child's exposure to suggestive questions and reducing the likelihood that the child will make contradictory statements to different interviewers.

Second, the Court of Appeals observed that the involvement of law enforcement in the CARES process is "pervasive." The court noted that a deputy had observed the evaluation of N and the evaluation team's discussion of treatment recommendations, and that he had met with N's mother immediately afterwards to discuss the investigation. The court also observed that, as a routine matter, CARES provides police agencies with complete copies of its evaluation reports. CARES had done exactly that in this case, and one of the "treatment recommendations" in that report was to urge "further investigation by DHS and law enforcement into these allegations of abuse."

In addition to the evidence that was before the Court of Appeals, youth submits further materials for this court's consideration. First, youth offers, as additional authority, a series of statutes from ORS 418.746 to 418.790, which

describe the formation of multidisciplinary teams for the purpose of investigating child abuse. Second, youth asks this court to take judicial notice of a fiscal report filed in 2008 with the Child Abuse Multidisciplinary Intervention (CAMI) Program of the Oregon Department of Justice. The state does not object to, or argue against, our consideration of either of those materials.

We begin with the statutes. ORS 418.783 establishes the CAMI program as a part of the Department of Justice. That program serves the following purposes, listed under ORS 418.783(1):

"(a) Establish and maintain a coordinated multidisciplinary community-based system for responding to allegations of child abuse that is sensitive to the needs of children;

"(b) Ensure the safety and health of children who are victims of child abuse to the greatest extent possible; and

"(c) Administer the grant programs established under ORS 418.746 and 418.786."

The "grant programs established under ORS 418.746" exist in order to fund, from money appropriated to the Department of Justice, multidisciplinary teams (MDTs) at the county level. ORS 418.746 provides, in part:

"(1) The Child Abuse Multidisciplinary Intervention Account is established separate and distinct from the General Fund. Interest earned, if any, shall inure to the benefit of the account. All moneys deposited in the account are continuously appropriated to the Department of Justice for the purposes of ORS 418.751 and this section.

"(2) The Child Abuse Multidisciplinary Intervention Program, with the advice of the Advisory Council on Child Abuse Assessment, created by ORS 418.784, shall allocate moneys from the Child Abuse Multidisciplinary Intervention Account to eligible county multidisciplinary child abuse teams formed under ORS 418.747, or entities designated by the teams, serving the counties from which the moneys were collected. * * *"

ORS 418.747, in turn, describes the requirements of those MDTs. Subsection (1) provides that the district attorney of each county is responsible for developing those teams and that they shall consist of:

"law enforcement personnel, Department of Human Services child protective service workers, school officials, county health department personnel, county mental health department personnel who have experience with children and family mental health issues, child abuse intervention center workers, if available, and juvenile department representatives, as well as others specially trained in child abuse, child sexual abuse and rape of children investigation."

Subsection (2) requires the teams to develop a written protocol "for immediate investigation of and notification procedures for child abuse cases and for interviewing child abuse victims." Subsection (3) requires that team members, including personnel who conduct interviews of child abuse victims, "shall be trained in risk assessment, dynamics of child abuse, child sexual abuse and rape of children and *legally sound* and age appropriate interview and investigatory techniques." (Emphasis added.)

ORS 418.746(7) requires the members of MDTs to submit annual reports to the team, and requires the MDTs to submit reports to CAMI, describing how they spent funds from the CAMI program and "to what extent the services were able to meet anticipated outcomes in terms of benefits to children and families." ORS 418.746(5) also requires MDTs to submit a "coordinated child abuse multidisciplinary intervention plan" to CAMI at least once per biennium. The report that youth submits for judicial notice appears to be one such plan, sent from the Multnomah County Child Abuse Team to CAMI, for the time period from July 1, 2003 to June 30, 2004. Again, the state has not objected to the submission of the report. Facts stated by the report appear to be "[c]apable of accurate and ready determination," and the report itself appears to be a source "whose accuracy cannot reasonably be questioned." OEC 201(b). Accordingly, we take notice of the report. *See* OEC 201(f) (providing that judicial notice may be taken "at any stage of the proceeding").

The report consists of a group of fiscal reports submitted by different members of the Multnomah County MDT, including the district attorney's office, the Portland Police Bureau, and CARES. The report submitted by CARES indicates that "[i]n the fiscal year ending June 30, 2004, approximately 40% of the cost related to providing child abuse medical evaluations was paid * * * by CAMI funds from Clackamas, Multnomah and Washington counties." The report identifies CARES' "community partners" as "law enforcement, District Attorney offices, DHS, medical and mental health providers."

A report submitted by the Multnomah County district attorney's office states that one of its goals is to "[r]esearch and provide to the CARES Northwest Program the dispositions of criminal cases regarding children who have been referred for assessment of child abuse." The report reveals a twofold reason for that research:

> "The collected data is used by the CARES Northwest Program to send a required bi-annual statistical report in support of their grant from the National Children's Alliance Program Support Grant, of which the CARES Northwest Program is a Full Member. The data is also used by the CARES Northwest Program to measure the usefulness of their evaluation process. Their evaluations strengthen the prosecution's cases concerning child abuse, thus reducing child abuse."

The district attorney's office performed such queries on 589 cases between July 1, 2003 and June 30, 2004. The results were reported to CARES "to assist in their measurement of the usefulness, *and possible adjustments, of their evaluation process whereby the prosecution's cases concerning child abuse may be strengthened.*" (Emphasis added.)

Those materials support the Court of Appeals' finding that law enforcement involvement in CARES is pervasive, and that CARES evaluations serve a forensic purpose in addition to any diagnostic purpose. CARES receives nearly half of its funding from an account that is administered by the Department of Justice. It partners with local police and the district attorney's office. Its members are trained in interview and investigatory techniques that are, among other

things, "legally sound." ORS 418.747(2) suggests that CARES' protocol for interviewing child abuse victims was developed by "teams," *i.e.*, the local MDT in which CARES is a partner. In other words, that statute provides an opportunity for the district attorney's office and the police to participate in the development of the protocol that CARES uses to interview the victims of child abuse. Indeed, the district attorney's office reports the results of cases to CARES for the express purpose of enabling CARES to "adjust" its process of evaluating child victims, in order to "strengthen the prosecution's cases concerning child abuse."

■ With that in mind, we direct our attention to the arguments that the state presents for reversal of the decision of the Court of Appeals. The state first argues that under *Crawford*, a statement is not "testimonial" if it is made to anyone other than a police officer or a government official. In this case, N made statements to Heiferman, a pediatrician, and Findlay, a social worker, both of whom are employed by CARES. The state insists that there is a "world of difference" between an examination at CARES and a police interrogation.

We disagree with that statement, and conclude that Heiferman and Findlay both acted, at least in part, as proxies for the police when they questioned N about whether youth had abused him. In *Mack*, we held that a DHS caseworker was acting as a "proxy for the police" when the caseworker interviewed a child about a crime that the child had witnessed. The caseworker acted at the behest of the police, who observed and videotaped the interview. *Mack*, 337 Or at 593.

This case presents a similar set of facts. First, as the Court of Appeals observed, the involvement of law enforcement in CARES is pervasive. CARES made the decision to evaluate N "because DHS needs clarification of the allegations," and recommended, at the end of the evaluation, "further investigation by DHS and law enforcement into these allegations of abuse." In other words, CARES apparently was acting, at least in material part, in concert with, and for the benefit of, law enforcement agencies in an investigation of conduct that could lead to a loss of youth's liberty. Second, when Heiferman and Findlay began to ask N questions about

whether anyone had touched or sucked his penis, they were inquiring about past conduct that potentially could lead to a loss of the perpetrator's liberty, as police officers do when they interview the victims of crime. Finally, as in *Mack*, a police officer observed the entire process of evaluation, including Heiferman's and Findlay's inquiry into whether N had been abused. After the evaluation, that officer spoke with N's mother about the "ongoing investigation." We do not perceive any material difference between these facts and those presented in *Mack*.

Service as a proxy for the police appears to be a primary function of CARES. CARES receives a significant amount of its funding from the Department of Justice. As a condition of receiving those funds, CARES must train its workers in "legally sound" interview techniques. ORS 418.747(3). As Findlay stated in his testimony, a goal of CARES is to "centralize" the process of interviewing child abuse victims and allow "law enforcement and DHS" to be "present to hear firsthand what the child says," so that they do not need to "reinterview the child themselves." In other words, an interview by CARES staff acts as a *substitute* for an interview with the police. In addition, CARES receives reports on the outcomes of child abuse cases in which it has evaluated the victim so that it may reassess its evaluation techniques in order to strengthen the prosecution's case. In light of all of those facts, we conclude that, when Heiferman and Findlay interviewed N, they were acting as proxies for the police. To use the language of *Davis*, N made the statements at issue in the course of something materially indistinguishable from "police interrogation."

The state asserts that the United States Supreme Court has held that statements to medical workers are not testimonial. In *White v. Illinois*, 502 US 346, 112 S Ct 736, 116 L Ed 2d 848 (1992), the defendant sought to exclude statements that the victim had made to, among others, a nurse and a doctor who had examined her at a hospital a few hours after the defendant had sexually assaulted her. The Court rejected the defendant's Sixth Amendment challenge

to that testimony, holding that statements made for the purpose of providing medical treatment carry "special guarantees of credibility," and thus were not barred by the Confrontation Clause. *White*, 502 US at 356-57. In *Crawford*, the Court stated that other aspects of *White* were "arguably in tension" with the holding of *Crawford*. However, the Court focused its analysis on the admission of the victim's statements to a police officer, and did not discuss the admission of her statements to the nurse and the doctor. *Crawford*, 541 US at 58 n 8. We noted, in *Mack*, that the Court "referred only to the statements that the child made to the officer as testimonial." *Mack*, 337 Or at 593 n 9. The state infers, from the discussion of *White* in *Crawford*, that a victim's statements to a nurse and doctor, made in the course of receiving medical treatment, are not considered testimonial.

Whatever the merits of that argument, it addresses an issue that is not presented by this case. As stated above, when Heiferman and Findlay asked whether N had been sexually abused, they were not acting solely as medical personnel. They also were acting as proxies for the police. The Court has stated that "[t]he involvement of government officers in the production of testimonial evidence presents the same risk, whether the officers are police or justices of the peace." *Crawford*, 541 US at 53. We cannot see why the involvement of physicians and social workers, if those physicians and social workers are acting as proxies for police officers, presents any less risk. Accordingly, we reject the state's first argument.[11]

---

[11] In the Court of Appeals, the state suggested that a physician at CARES is "indistinguishable from an individual pediatrician who is subject to mandatory obligations to report suspected child abuse." The Court of Appeals rejected that argument, drawing several distinctions between CARES workers and individual pediatricians. On review, we decline to address the question of whether a legally imposed obligation to report child abuse, without further ties to the state, makes a physician a proxy for the police. That question is not presented by the facts of this case. We think that it suffices to say that, for the reasons presented above, CARES acted as a proxy for the police.

We note that in *Giles v. California*, 554 US ____, 128 S Ct 2678, 171 L Ed 2d 488 (2008), the Court considered whether a defendant forfeits his federal right of confrontation when the defendant kills the witness, preventing her from testifying at trial. The Court observed, in *dicta*, that the federal Confrontation Clause would not exclude "[s]tatements to friends and neighbors about abuse and intimidation, and statements to physicians in the course of receiving treatment * * *." *Id.* at

■ The state's second argument is that, under *Davis*, whether or not a statement is testimonial is governed by "the primary purpose of the interrogation," and not by any secondary or alternative purpose. *Davis*, 547 US at 822. In the instant case, the state asserts, the primary purpose of the examination of N was "to diagnose and treat the abuse [that he] had suffered." The state raises several challenges to the Court of Appeals' evaluation of the role and purpose of CARES, arguing that the court exaggerated the forensic purpose of N's examination and understated the medical purpose. As an alternative argument, the state contends that, even if the Court of Appeals was correct in holding that the examination of N had a dual purpose, any forensic purpose was secondary, and the purpose of medical diagnosis was primary.

As we have stated above, we infer the primary purpose of an interrogation from the contents and circumstances of N's statements. First, we note that, when N made the statements at issue, he was describing past events. He told Heiferman and Findlay about acts that youth had committed the day before N's evaluation. Second, a reasonable person could infer two conclusions from N's statements to Heiferman and Findlay: either that N was responding to a doctor's examination, or that N was responding to a police interrogation. N made statements about acts of sexual abuse that he had suffered: He described what the abuser had done, how many times the abuser had done it, and identified who the abuser was. Those statements are relevant to the question whether N needed medical or psychological treatment for the abuse that he suffered. They are also relevant to the question of the potential bases of the trial court's jurisdiction over the alleged perpetrator of the abuse. Third, for similar reasons, a reasonable person could infer that N's statements were necessary both for determining whether he needed treatment for the abuse and for pursuing his abuser in juvenile court. Finally, N made his statements within the tranquility of a formal setting similar to that at issue in *Crawford*. At the

_____, 128 S Ct at 2692-93. Again, however, the facts of this case do not present the question whether statements made to a private physician, for the purpose of receiving medical diagnosis and treatment, are testimonial.

time of the statements, N was in an examination room, separated from his mother, from youth, and from anyone except Heiferman and Findlay—and, of course, the officer who was listening in via microphone. N described, in response to structured questioning by Heiferman and Findlay, the details of past events with serious consequences for youth, including a potential loss of liberty. And N did so about 24 hours after those events had taken place.

Given the content and circumstances of N's statements, we find that the Court of Appeals was correct to conclude that the evaluation of N served a dual purpose. N's statements were necessary to provide an accurate diagnosis of whether N had been abused, but they were also necessary to develop and preserve evidence of the alleged abuse for later presentation in juvenile court. The two purposes "are concurrent and coequal; both are 'primary' in the sense that neither takes precedence over the other." *S. P.*, 218 Or App at 154. The facts of this case thus present a problem requiring further analysis, because either of those purposes can be described as "primary" under *Davis*.

To resolve that problem, we turn to another aspect of *Davis*. In its analysis of the facts of both *Davis* and *Hammon*, the Supreme Court concluded by asking the same question: was the declarant testifying? In other words, was the declarant's statement a "solemn declaration or affirmation made for the purpose of establishing or proving some fact"? *Crawford*, 541 US at 51 (defining "testimony") (internal quotation marks omitted). In *Davis*, the Court concluded that a woman who made a 9-1-1 call, seeking help for a present emergency, was "not acting as a *witness*; she was not *testifying*. * * * No 'witness' goes into court to proclaim an emergency and seek help." *Davis*, 547 US at 828 (emphasis in original). On the other hand, in *Hammon*, a woman describing an incident of domestic violence that had ended minutes or hours ago "deliberately recounted, in response to police questioning, how potentially criminal past events began and progressed." Her statements were "an obvious substitute for live testimony, because they do precisely *what a witness does* on direct examination * * *." *Davis*, 547 US at 830 (emphasis in original). In other words, the Court concluded its discussions

of both *Davis* and *Hammon* by inquiring whether the declarant's statements were the equivalent of "testimony."

If that is the ultimate question that the Supreme Court instructs us to ask when a declarant makes statements in response to police interrogation or its equivalent, then we must conclude that N's statements to CARES were testimonial. Obviously, no witness goes into court to seek medical treatment. But witnesses do go into court to describe past sexual misconduct, and that is exactly what N did at CARES. N made his statements in a formal setting, in response to structured questions about past events with potential serious consequences for youth, as we have noted. From a functional standpoint, N's examination was similar to the *ex parte* examinations condemned in *Crawford*. N acted as a witness; he bore testimony against youth.

As stated above, we acknowledge that N's evaluation served two purposes. CARES sought to produce statements that it could use against youth in this proceeding, and it also sought to determine the extent of N's abuse in order to recommend treatment. Those are laudable goals, but they do not change the fact that CARES conducts the sort of *ex parte* examinations that trigger the right secured by the Confrontation Clause. Accordingly, we hold that, for the purposes of *Davis*, the "primary purpose" of N's examination, which, as already noted, was conducted by persons acting as proxies for the police, was to establish or prove past events relevant to determining the trial court's jurisdiction over youth. In short, N's statements to CARES—both describing the abuse committed *and* identifying youth as the perpetrator —were testimonial.[12]

---

[12] The state also asserts that, in both *Davis* and *Camarena*, the 9-1-1 operators had dual purposes—both to resolve present emergencies and to make records for future criminal investigation—and yet, both this court in *Camarena* and the Court in *Davis* held that the declarant's statements were nontestimonial. For that reason, the state asserts that, if an interrogation serves dual purposes, then statements made during that interrogation are not testimonial—in other words, the nonforensic purpose controls. We reject that argument. As we have explained, *Davis* and *Camarena* focus primarily on the content and circumstances of the declarant's statements, not the subjective intent of the questioner. The Court did not hold that statements to a 9-1-1 operator, made during an emergency, were nontestimonial because the operator had a dual purpose. Rather, it held that the statements were nontestimonial because a declarant who proclaims a *present emergency* does not bear testimony; the declarant is not describing past events with potential criminal consequences.

For its third argument, the state asserts that whether a statement is testimonial is determined by the primary purpose of the declarant. The state makes that argument based on the Court's statement that "it is in the final analysis the declarant's statements, not the interrogator's questions, that the Confrontation Clause requires us to evaluate." *Davis*, 547 US at 823 n 1.

The state also points to *Bourjaily v. United States*, 483 US 171, 107 S Ct 2775, 97 L Ed 2d 144 (1987), as an example of a case in which the declarant's intent was dispositive. In *Bourjaily*, an FBI informant arranged to sell a kilogram of cocaine to the declarant. The declarant, unaware that he was speaking to an informant, made statements on the telephone suggesting that the defendant was interested in distributing the cocaine. The trial court admitted those statements as statements of a coconspirator, and the Supreme Court confirmed that the admission of coconspirators' statements, made in the course and in furtherance of a conspiracy, did not violate the Confrontation Clause under *Roberts*. *Bourjaily*, 483 US at 183-84. In *Davis*, the Court cited *Bourjaily* as a case in which "the statements at issue were clearly nontestimonial." *Davis*, 547 US at 825. The state asserts that the informant in *Bourjaily* "undoubtedly acted with the primary purpose of obtaining statements that could be used to investigate and prosecute criminal acts." Accordingly, the state asserts, it must have been the primary purpose of the declarant—who had no idea that he was speaking to an informant—that determined whether the statements at issue were testimonial.

We already have explained that whether a statement is testimonial is determined by its content and the surrounding circumstances. Thus, in examining all the circumstances, the knowledge and intentions of all persons involved in the interrogation are pertinent to the court's inquiry. We reject, as we did in *Mack*, the argument that a declarant's intent alone is dispositive of the testimonial nature of his or her statements. The focus in *Crawford* and *Davis* is on the method by which the police obtain a declarant's statements or, as *Davis* puts it, by the "primary purpose of the interrogation." We cannot imagine why the Court would have used

that phrase if it had meant to refer only to the primary purpose of the *declarant*.

*Bourjaily* is not to the contrary. These are the relevant facts of that case:

> "In May 1984, Clarence Greathouse, an informant working for the Federal Bureau of Investigation, arranged to sell a kilogram of cocaine to Angelo Lonardo. Lonardo agreed that he would find individuals to distribute the drug. When the sale became imminent, Lonardo stated in a tape-recorded telephone conversation that he had a 'gentleman friend' who had some questions to ask about the cocaine."

*Id.* at 173. When we examine the facts of *Bourjaily*, we find that it does not, in fact, establish that the purpose of a declarant alone determines the primary purpose of an interrogation. Rather, *Bourjaily* is consistent with the Court's statement that a declarant's statements are not testimonial when the declarant is not acting as a witness. Lonardo, the declarant in *Bourjaily*, stated to the informant that "he had a 'gentleman friend' who had some questions to ask about the cocaine." The actions described in that statement do have criminal consequences, but they do not describe *past events*. Instead, they are an invitation to future criminal activity. Although Lonardo's statements were tape-recorded by the police, it is highly unlikely that Lonardo made them in a formal setting. Moreover, Lonardo was conversing with an informant. It is unlikely that the conversation between Lonardo and the informant resembled the structured questioning at issue in *Crawford*, *Davis*, or this case. Lonardo was not making formal assertions about past events. In short, Lonardo was not acting as a witness.

We acknowledge, as we did in *Mack*, that a declarant's purpose in making a statement may determine whether the statement is testimonial. The instant case, however, does not present such a situation. The instant case presents an *ex parte* examination that is "effectively indistinguishable" from those "that *Crawford* places at the heart of the Confrontation Clause protections." *Mack*, 337 Or at 594-95.

In conclusion, we hold that N's statements to CARES, in which he identified youth as his abuser and described the occurrence and extent of the abuse, are

testimonial. Because youth had no prior opportunity to cross-examine N, the Confrontation Clause of the Sixth Amendment bars admission of those statements in this proceeding. The Court of Appeals, in reaching that conclusion, determined that, once N's statements to CARES were excluded, there remained sufficient evidence to assert jurisdiction over youth for conduct that, if committed by an adult, would constitute first-degree sexual abuse, but not first-degree sodomy. *S. P.*, 218 Or App at 157-58. Neither party argues that the Court of Appeals erred in reaching that conclusion, and we see no reason to disturb it.

The decision of the Court of Appeals is affirmed. The finding of the juvenile court of jurisdiction on the ground that youth engaged in conduct that, if committed by an adult, would constitute first-degree sodomy is reversed. The finding of the juvenile court of jurisdiction on other grounds is affirmed, and the case is remanded to the juvenile court for further proceedings.