# IN THE COURT OF APPEALS OF IOWA

No. 14-0357
Filed May 6, 2015

IN THE INTEREST OF J.C.,
        Minor Child,

**J.C., Minor Child,**
        Appellant.

_____

Appeal from the Iowa District Court for Scott County, Christine Dalton, District Associate Judge.

A minor appeals the trial court's order finding him delinquent for committing assault with the intent to commit sexual abuse. **AFFIRMED.**

Timothy J. Tupper, Davenport, for appellant.

Thomas J. Miller, Attorney General, Bruce Kempkes, Assistant Attorney General, Michael Walton, County Attorney, and Elizabeth Cervantes, Assistant County Attorney, for appellee.

Considered by Vaitheswaran, P.J., and Tabor and Mullins, JJ.

**MULLINS, J.**

J.C. appeals the trial court's order finding him delinquent for committing assault with the intent to commit sexual abuse. J.C. asserts the trial court erred in allowing the testimony of Catherine Jackson notwithstanding the State's failure to provide sufficient notice and a full and fair statement of her testimony. He asserts his right to confront the victim, A.W., was violated when the court admitted A.W.'s statements via Michele Mattox, Dr. Harre, and Dr. Harre's report. Finally, J.C. contends the trial court erred in admitting A.W.'s statements due to her incompetency. We affirm the order of the trial court.

## I.    Background Facts and Proceedings

On July 2, 2013, twelve-year-old J.C. was socializing with several other children at his friend K.W.'s house. K.W. shared this home with four-year-old A.W. Sometime that afternoon, A.W. was heard screaming from an upstairs bedroom. Other children present in the home ran upstairs in response.

One child testified he saw J.C. pulling down A.W.'s underwear. A.W. was lying on her back, and J.C. was on his knees; they were both on the floor. Another child testified she saw A.W. "pinned to the bed" by J.C., who was lifting up A.W.'s shirt like he was taking her clothes off. Yet another child testified J.C. had his arm over A.W. and was lying next to her. J.C. was red faced and denied any wrongdoing. The other children took A.W. downstairs to her mother. J.C. ran outside.

A.W.'s mother immediately filed a police report and took A.W. to the hospital. During the ensuing investigation, the police interviewed the children

and recovered two videos and four photographs from K.W.'s phone. The photographs showed J.C.'s exposed penis. The videos depicted J.C. masturbating, and in one video J.C. stated K.W. would be performing a sex act on him that night. One of the other children present that day testified that earlier J.C. tried to show her photographs on the phone, but she covered her eyes. He also requested a photograph of her chest and tried to touch her chest; both requests were denied. In the past, J.C. had asked this child to have sex.

The hospital and police referred A.W. to Dr. Harre and Michele Mattox at the Child Protection Response Center (CPRC). Dr. Harre conducted a medical examination to evaluate any genital contact. A.W. told Dr. Harre J.C. touched her boob and bottom area, but A.W.'s physical examination was normal. Michele Mattox conducted a forensic interview, during which A.W. revealed J.C. hurt her private parts with his genitalia.

In August 2013, J.C. was charged with assault with intent to commit sexual abuse, in violation of Iowa Code section 709.11 (2013). J.C.'s delinquency hearing was held in December 2013. In addition to hearing the testimony of Dr. Harre, Mattox, A.W.'s mother, and the children who witnessed A.W.'s assault, the State called Catherine Jackson to testify. Jackson is a psychologist who, though she had not personally interviewed A.W., testified that a sexually abused girl A.W.'s age, exhibiting speech delays and heightened anxiety like A.W., would be harmed by testifying.

The trial court found J.C. was a delinquent child. It held that the state of A.W.'s clothing evidenced J.C.'s intent to sexually assault her; this was

supported by Dr. Harre's testimony that A.W. stated J.C. touched A.W.'s boob and bottom area and the photographs, videos, and witness testimony illustrating J.C.'s "heightened interest in sexual activity."  J.C. appeals the trial court's delinquency order.

## II.    Jackson's Testimony

J.C. contends the trial court erred by allowing Jackson to testify because the State failed to provide J.C. a "full and fair" statement of her testimony, failed to file the appropriate notice, and failed to inform J.C. that Jackson would testify until the day before trial, in violation of Iowa Rule of Criminal Procedure 2.5(3). This rule provides that "[t]he prosecuting attorney shall . . . file the minutes of evidence of the witnesses . . . and a full and fair statement of the witness' expected testimony" prior to trial.  Iowa R. Crim. P. 2.5(3).  Our scope of review for juvenile court proceedings is de novo.  *State v. Iowa Dist. Ct.*, 750 N.W.2d 531, 534 (Iowa 2008) (citations omitted); *In re E.P.*, 478 N.W.2d 402, 403 (Iowa 1991) (holding that an appellate court is not bound by juvenile court's factual findings, but it gives them weight).

At the outset, the State asserts J.C. waived this argument on appeal by failing to move for a continuance, pursuant to *State v. Epps*, 313 N.W.2d 553, 557–58 (Iowa 1981), and by failing to argue rule 2.5(3) applied to juvenile delinquency hearings.  The State argues, alternatively, that any error in not disclosing Jackson's testimony earlier did not constitute reversible error as both A.W.'s mother and Mattox testified regarding the same subject matter—that it

would be detrimental to A.W. for her to testify at the hearing, so Jackson's testimony was cumulative.

J.C. has cited no authority in support of his assertion that the requirements of rule 2.5(3) are applicable to this juvenile delinquency case. Iowa Code section 232.35 provides that the manner of commencing "a formal judicial proceeding to determine whether a child has committed a delinquent act" is by the filing of a petition. Section 232.36 specifies the contents of the petition. Iowa Rules of Juvenile Procedure 8.1 and 8.2 set forth the scope of discovery and access to records. In the case of *In re Dugan,* 334 N.W.2d 300, 305 (Iowa 1983), our supreme court rejected a claim that a juvenile delinquency petition must also comply with what was then rule 5(3) (now rule 2.5(3)). "We have long recognized that a juvenile court proceeding is not a prosecution for crime, but a special proceeding that serves as an ameliorative alternative to a criminal prosecution." *In re C.T.F.,* 316 N.W.2d 865, 866-67 (Iowa 1982). Accordingly, J.C.'s claim based on a violation of rule 2.5(3) is rejected.

Although J.C. cites no other authority in support of his claim of surprise as to the testimony of Jackson, we note J.C. has neither claimed the lateness of disclosure disadvantaged him in trial preparation nor shown that the subject of Jackson's testimony was a surprise. Accordingly, we agree with the district court that "[J.C.] knew [A.W.'s availability] was going to be an issue," and we find that because J.C. was presented with the correspondence between the State and Jackson—which evidenced that Jackson would testify regarding unavailability— the court committed no error in allowing the testimony.

### III. Mattox's and Dr. Harre's Testimony

Next, J.C. asserts the trial court's admission of Mattox's testimony, Dr. Harre's testimony, and Dr. Harre's exam report violated his Confrontation Clause right as the admission included A.W.'s testimonial statements, J.C. had no prior opportunity to cross-examine A.W., and A.W. was not "unavailable." The trial court admitted Mattox's and Dr. Harre's testimony pursuant to Iowa Rules of Evidence 5.803(4) and 5.807. It noted J.C.'s Confrontation Clause objection, but did not elaborate on it in its order.[1] We review Confrontation Clause claims de novo. *State v. Harper*, 770 N.W.2d 316, 319 (Iowa 2009) (citations omitted).

The Sixth Amendment to the United States Constitution guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI; *see also* Iowa Const. art. I, § 10 (same). "[T]his provision bars 'admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination.'" *Davis v. Washington*, 547 U.S. 813, 821 (2006) (citing *Crawford v. Washington*, 541 U.S. 36, 53–54 (2004)).

---

[1] The State argues J.C. waived this claim for appeal by failing to file an Iowa Rule of Civil Procedure 1.904(2) motion after the trial court failed to specifically address this claim in its order, per *State Farm Mut. Auto. Ins. Co. v. Pflibsen*, 350 N.W.2d 202, 206 (Iowa 1984). A rule 1.904(2) motion is the not a prerequisite to preserving appeal, however. *See Meier v. Senecaut*, 641 N.W.2d 532, 538 (Iowa 2002). "The test to determine the sufficiency of an objection to preserve error is whether the exception taken alerted the trial court to the error which is urged on appeal." *State v. Kennedy*, 846 N.W.2d 517, 520-21 (Iowa 2014). We find error was preserved as, given J.C.'s numerous Confrontation Clause objections, the "district court understood the substance of trial counsel's objection and was able to determine whether the objection had merit." *See id.* at 521. We will assume without deciding that error was preserved under the Iowa Constitution as well. *See id.* at 522 (holding that the Federal and Iowa Confrontation Clauses will be interpreted the same absent an assertion to the contrary).

Only testimonial statements come within the reach of the Confrontation Clause. *See Crawford*, 541 U.S. at 51. Accordingly, we begin our analysis with the threshold determination of whether A.W.'s statements to Mattox and Dr. Harre were testimonial. *See Harper*, 770 N.W.2d at 321. Our analysis will address the issue generally as J.C.'s brief does not identify specific statements that he claims were testimonial.

The Iowa Supreme Court determined whether a child's out-of-court statements describing sexual abuse were testimonial in *State v. Bentley*. *See* 739 N.W.2d 296, 297 (Iowa 2007). That case involved a ten-year-old girl's out-of-court statements made to a Child Protection Center (CPC) counselor. *Id.* The court held that "[t]he interview of [the child victim] was essentially a substitute for police interrogation." *Id.* at 299. In so holding, the court emphasized CPC's ongoing relationship with police, that police referred child victims of sexual abuse to the CPC for "forensic interviews," that police met with the CPC counselor prior to the interview, that police were present during the interview, and that the child victim was informed of their presence. *Id.* at 299-300. The "indicia of formality" surrounding the child victim's statements reinforced the court's holding that the statements were the "product of police interrogation." *Id.* at 300 (noting that the child victim spoke in room designed to facilitate forensic interviews, as indicated by the observation window and video equipment, and the child victim answered structured questions concerning past events).

The Iowa Supreme Court later distinguished *Bentley* from other statements made to medical personnel in *Harper*, 770 N.W.2d at 316 and *State*

*v. Schaer*, 757 N.W.2d 630 (Iowa 2008). The *Schaer* court held that a woman's statements to medical personnel that she had been beaten were nontestimonial because, unlike *Bentley*, they lacked an "indicia of formality." *See* 757 N.W.2d at 637 (noting the lack of relationship between medical personnel and police indicated the questioning was not "a substitute for police interrogation"). The *Harper* court held that a woman's statements to medical personnel that defendant raped her, tied her, and set her house on fire were nontestimonial because, unlike *Bentley*, the woman's statements were made to assist the doctors in treating her. *See* 770 N.W.2d at 323 (finding that doctor's question to the woman was posed to further her treatment, not to establish or prove some fact).

A. <u>Dr. Harre</u>

Dr. Harre has been employed by CPRC since 2006. She is board certified in child abuse pediatrics. During her interview with A.W., Dr. Harre asked several questions regarding A.W.'s recent physical symptoms and the contact J.C. had with her. She performed a physical examination thereafter and completed a report based upon A.W.'s medical history, physical exam, and emergency room records. Her report was medical—she indicated A.W. had no abnormal physical symptoms or infections and need not follow up with her.

Even though Dr. Harre's employer—the CPRC—is similar to the CPC organization in *Bentley*, we find Dr. Harre's interview lacked the "indicia of formality" present in *Bentley*; indeed, any forensic elements Dr. Harre's examination exhibited were for the purposes of facilitating A.W.'s physical

examination. *See* 739 N.W.2d at 300. Given the medical nature of the examination, A.W.'s statements were most similar to those in *Harper*.[2] *See* 770 N.W.2d at 323. As such, they were nontestimonial. Since nontestimonial statements fall outside the purview of the Confrontation Clause, neither the admission of Dr. Harre's testimony nor the admission of her exam report constituted error. *See Crawford*, 541 U.S. at 51.

B. Mattox

Mattox has been employed by the CPRC since 2010. She is a trained forensic interviewer. A.W. was referred to her by the police for the purposes of ruling out sexual contact with a twelve-year-old child. The interview was videotaped, and the police observed it on a closed circuit TV. Near the close of the interview, the police passed a note to Mattox with additional questions.

Given that A.W. was not physically examined and that Mattox's questions concerned past events, we do not find A.W.'s statements were made for procuring treatment like in *Harper*. *See* 770 N.W.2d at 323. Nor do we find the interview here was informal, like in *Schaer*. *See* 757 N.W.2d at 637. Like *Bentley*, the police referred A.W. to the CPRC, they relayed information to Mattox prior to the interview, they were present for it, and they directed at least some of Mattox's questions. *See* 739 N.W.2d at 299–300. These questions pertained to past incidents of sexual abuse and were asked in a room designed for forensic

---

[2] The fact that the physical examination did not show any physical injuries or the need for further medical treatment should not be considered as diminishing the medical treatment reasons for the examination and the taking of a history as part of the examination.

interviews. *See id.* at 300. Consequently, we find A.W.'s statements to Mattox were testimonial.

The "Confrontation Clause is a constitutional error subject to a harmless-error analysis." *Kennedy*, 846 N.W.2d at 527 (citations omitted). It must be proved "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained" to establish harmless error. *Id.* (citations omitted). This requires a two-step analysis. *See State v. Hensley*, 534 N.W.2d 379, 383 (Iowa 1995). "The first step of the analysis requires us to ask what evidence the fact finder actually considered to reach its verdict." *Kennedy*, 846 N.W.2d at 527 (citations omitted). The second step requires us to "weigh the probative force of that evidence against the probative force of the erroneously admitted evidence standing alone." *Id.* at 528 (citations omitted).

J.C. objected to the State's offer of Exhibits 4 and 5—Mattox's report and video of her interview. In its written ruling, the court sustained the objection and did not admit the exhibits into evidence. The court only referred to A.W.'s statements to Mattox in its findings to confirm that J.C. had his clothes on and did not penetrate A.W. However, the court stated that Dr. Harre also confirmed the lack of penetration, and eyewitness accounts confirmed that J.C. was clothed during the incident. In this regard, Mattox's testimony as it pertains to A.W.'s statements was cumulative.

The court relied largely on the eyewitness accounts of the other children, the videos and photos that indicated J.C.'s heightened sexual awareness, and Dr. Harre's statements that A.W. communicated J.C. "touched her boob area and

her bottom area" in formulating its order. Applying the second step of test from *Kennedy*, 846 N.W.2d at 528, we hold that the force of the properly admitted evidence was so overwhelming that there can be no reasonable doubt the verdict would have been the same without the erroneously admitted testimony of Mattox. Thus, any Confrontation Clause violation constituted harmless error. *See State v. Wells*, 738 N.W.2d 214, 218 (Iowa 2007).

## IV.    A.W.'s Competency

J.C. asserts the trial court erred in allowing Dr. Harre and Mattox to testify regarding A.W.'s statements when A.W. was not competent to testify herself. A.W.'s competency is only relevant insofar as it goes to the reliability of Dr. Harre and Mattox's expert testimony; therefore, we characterize J.C.'s challenge as one to the basis of Dr. Harre's and Mattox's expert opinion.

### A.  Dr. Harre

Dr. Harre conducted a medical examination of A.W., and she was called to testify regarding her resultant medical opinion. Pursuant to rule 5.803(4), the trial court allowed Dr. Harre to testify as to the statements A.W. made to her during her examination—statements for the purposes of medical treatment or diagnosis.

As an expert, Dr. Harre could disclose the underlying basis for her opinion so long as the court found that a patient's statements are those upon which doctors reasonably rely. *See* Iowa R. Evid. 5.703 cmt. ("[T]he underlying factual basis for the opinion need not be previously admitted or even admissible independently of the opinion, if it is of such a nature and type reasonably relied upon by experts in the particular field."); *Brunner v. Brown*, 480 N.W.2d 33, 35

(Iowa 1992) (holding that judge determines whether the evidence is reasonably relied upon).

In admitting Dr. Harre's statements pursuant to rule 5.803(4), the district court found A.W.'s statements to be the type upon which a doctor would reasonably rely. *See State v. Hanes*, 790 N.W.2d 545, 553 (Iowa 2010) (holding that rule 5.803(4) requires the court to find the content of the statement must be such as is reasonably relied on by a physician). Because of this finding, A.W.'s statements were admissible pursuant to rule 5.703, notwithstanding questions concerning her competency.[3] *See, e.g.*, Iowa R. Evid. 5.703 advisory committee's note (noting that the observation of the witness by a doctor is an example of information reasonably relied upon).

B. Mattox

As we have already concluded Mattox's testimony regarding statements A.W. made during the interview was cumulative of the testimony offered by Dr. Harre and the eyewitnesses, we conclude any error here was harmless as well.

**V.      Conclusion**

We find the admission of Jackson's testimony was not reversible error because J.C. was neither surprised nor disadvantaged by it. The admission of A.W.'s statements via Dr. Harre did not constitute error as A.W.'s statements

---

[3] We note a court may not rely upon rule 5.703 to admit statements for their truth. *See Gacke v. Pork Xtra, L.L.C.*, 684 N.W.2d 168, 183 (Iowa 2004) (holding that evidence admitted pursuant to 5.703 is not admissible as substantive evidence of the matters asserted therein). However, in this case A.W.'s statements to Dr. Harre were also properly admitted pursuant to rule 5.803(4), and thus, the statements could be considered for the truth of the matter asserted. The fact the statements were also admissible pursuant to rule 5.703 did not preclude the trial court from considering their truth.

13

were nontestimonial and A.W.'s incompetency went to the credibility of Dr. Harre's opinion, not its admissibility.  The admission of A.W.'s statements to Mattox constituted harmless error given their cumulative nature and the trial court's lack of reliance on them.  We affirm the trial court's order.

**AFFIRMED.**

Vaitheswaran, P.J., concurs; Tabor, J., dissents.

**TABOR, J.** (dissenting)

I respectfully dissent. J.C.'s right to confront witnesses against him was violated by the admission of testimonial statements from A.W. offered through Dr. Harre and forensic interviewer Michele Mattox. Dr. Harre and Mattox work together at the Child Protection Response Center (CPRC) in Davenport. Dr. Harre is the medical director there and Mattox conducts forensic interviews with children who are referred because of physical and sexual abuse issues. The center receives referrals from police departments, the Iowa Department of Human Services, other physicians, therapists, and emergency rooms.

Dr. Harre testified A.W. was referred from the Genesis emergency room where she was seen on July 3, 2013. A.W.'s mother and grandmother first took A.W. to the police station after learning she may have been molested. The mother testified:

> they told me to take her in, get her examined. . . . Then the hospital told me to make an appointment with the doctor lady to talk to her and find out if there was anything else going on, and that's what I did. And we just waited for it all to come out the way it did.

A.W.'s father brought A.W. to the CPRC nearly one month later, on July 31, 2013.

Dr. Harre's report offered into evidence described the "presenting concerns" as follows: "The referral to this Center was to address concerns brought up after the recognition of a 12-year-old adolescent boy being caught being inappropriate with this child." The letter exhibit authored by Dr. Harre recounted the history of the incident in detail as told to her by A.W.'s father

before Dr. Harre interviewed A.W.[4]  Dr. Harre's report continued: "[A.W.] did separate to go with this examiner to the history taking area."  At this juncture, Dr. Harre reviewed "truth lie concepts with the child" and "did stress that it was important for her to tell me the truth."  It was in the "history taking area" where A.W. told Dr. Harre that J.C. "touched me boob" and "touched front bottom."  It was also during this pre-exam interview that Dr. Harre asked A.W. how the touching felt, and A.W. responded, "Hurt."  For the physical evaluation process, Dr. Harre and A.W. moved to a separate examination room, where they were joined by A.W.'s father.  A.W.'s medical exam did not reveal any abnormal conditions that Dr. Harre attributed to the alleged abuse.

The majority decides A.W.'s statements to Dr. Harre were properly admitted because they were "nontestimonial" and therefore fell "outside the purview of the Confrontation Clause"—distinguishing *State v. Bentley*, 739 N.W.2d 296, 301-02 (Iowa 2007) and relying on *State v. Harper*, 770 N.W.2d 316, 323 (Iowa 2009).  This argument was not advanced by the State on appeal.  Instead, the State argued in its brief that A.W.'s statements to Dr. Harre and Mattox were admissible because they bore sufficient "indicia of reliability" under *Ohio v. Roberts*, 448 U.S. 56 (1980).  The State failed to recognize in its brief that *Roberts* was abrogated by *Crawford v. Washington*, 541 U.S. 36, 58 (2004).

---

[4] At the end of the letter to the Scott County Attorney, Dr. Harre wrote: "Thank you for allowing me to participate in this assessment of this child and family.  Please feel free to contact me if you have any further questions or concerns not adequately addressed in this report are raised.  Face-to-face time with the patient and family involved 1½ hours. Report creation required 2½ hours of time."  It is not apparent from the record why the prosecution needed to know the hours spent by the center on the child abuse assessment.

I do not believe we should "assume a partisan role and undertake the [appellee's] research and advocacy." *See State v. Piper*, 663 N.W.2d 894, 914 (Iowa 2003) *overruled on other grounds by State v. Hanes*, 790 N.W.2d 545 (Iowa 2010).

Even if we were to undertake the State's role in researching the confrontation clause issue, I would find the facts in this case more closely resemble the circumstances in *Bentley* than in *Harper*. *Bentley* held the statements of J.G., a ten-year-old sexual abuse victim, to a forensic interviewer were testimonial because of the indicia of "formality" at the child protection center. The *Bentley* court wrote:

> J.G. spoke in a calm environment responding to a series of structured questions posed by [the interviewer]. The statements constituted a historical account of past events, deliberately provided in response to questioning regarding past events. The statements were made in an environment designed and equipped to facilitate forensic interviews calculated to collect evidence against those suspected of abusing children.

739 N.W.2d at 300.

The majority accurately notes the similarity between Dr. Harre's child abuse response center and the child protection center in *Bentley*. But the majority goes on to find Dr. Harre's interview lacked the indicia of formality found in *Bentley* because any forensic elements were aimed at facilitating A.W.'s physical examination. The majority reasons: "Given the medical nature of the examination, A.W.'s statements were most similar to those in *Harper*." In *Harper*, our supreme court distinguished the arranged, formal interview with the victim in *Bentley*, from an emergency room doctor's question, "what happened?" to a badly burned patient brought in by ambulance. *Harper*, 770 N.W.2d at 323. The

*Harper* court found the victim's response that the defendant raped her, bound her, and set her house on fire was nontestimonial because its primary purpose was to assist the physicians in treating her and not for use in a future prosecution. *Id.* (applying test from *Davis v. Washington*, 547 U.S. 813, 822 (2006)).[5]

I respectfully disagree with the majority's analysis. While it may not be the final interpretation of the federal confrontation clause,[6] we are currently bound to follow our supreme court's ruling in *Bentley*. A medical purpose for the child's interview did not sway the *Bentley* court to find the child's statements to be nontestimonial. *Bentley*, 739 N.W.2d at 302 (acknowledging "one of the significant purposes of the interrogation was surely to protect and advance the treatment of J.G."). The *Bentley* court found "the extensive involvement of the police in the interview rendered J.G.'s statements testimonial." *Id.*; *see also United States v. Bordeaux*, 400 F.3d 548, 556 (8th Cir. 2005) ("That AWH's statements may have also had a medical purpose does not change the fact that they were testimonial, because *Crawford* does not indicate, and logic does not

---

[5] The *Harper* court also cites *Giles v. California*, 554 U.S. 353, 376 (2008) for the proposition that statements to physicians through the course of treatment would only be excluded by hearsay rules. That proposition was dicta in *Giles* as the Court's holding was based on the doctrine of forfeiture by wrongdoing. *Id.* at 377.

[6] The United States Supreme Court held oral argument last month in a confrontation clause case involving a child witness reporting abuse in response to a question from a day care teacher. *See Ohio v. Clark*, 2015 WL 865313 (March 2, 2015). A divided Ohio Supreme Court decided the statements were testimonial because the teacher, a mandatory reporter, acted in a dual capacity, as both an instructor and as an agent of the state for law-enforcement purposes, when eliciting statements from child as to how child had been injured and admission of the statements at trial violated defendant's confrontation rights. *State v. Clark*, 999 N.E.2d 592, 599-600 (Ohio 2013). The U.S. Supreme Court's decision in *Clark* may shed more light on when a child's report of abuse will be considered testimonial.

dictate, that multi-purpose statements cannot be testimonial."); *see also State v. Henderson*, 160 P.3d 776, 791 (Kan. 2007) (chronicling post-*Davis* cases holding statements obtained during interviews in child advocacy centers were testimonial).

It is true an officer did not accompany A.W. to the interview with Dr. Harre and police were not as directly involved as in the *Bentley* case. But A.W.'s family sought help from the police, who referred them to the emergency room staff, who referred them to Dr. Harre. Dr. Harre did not see A.W. until one month after the incident. The purpose of A.W.'s visit to the center was to address concerns about inappropriate contact from an older child. Dr. Harre did not limit her interaction with the child to a medical exam. Instead, she took A.W. to a "history taking area" of the center, where the doctor quizzed the child on the difference between telling the truth and lying. Dr. Harre then asked a series of carefully crafted questions, which elicited A.W.'s statements incriminating J.C. that Dr. Harre repeated in court. As the court noted in *Bentley*, child protection centers serve laudable goals. *Id.* But their primary goals include evidence gathering and securing a child's statements for use in a later prosecution. *Id.* The purpose of Dr. Harre's scheduled interview with A.W. was a far cry from the single, on-the-fly question of "what happened" asked by a doctor in the emergency room where Harper's victim was brought by ambulance for urgent treatment. *See Davis*, 547 U.S. at 822 (drawing a distinction between nontestimonial statements made under circumstances objectively indicating the primary purpose was "to meet an

ongoing emergency" and testimonial statements made to "prove past events potentially relevant to later criminal prosecution").[7]

The majority is right in concluding this case differs from *Bentley*. But I question whether it diverges enough that A.W.'s statements may be viewed as falling outside the "core" class of testimonial statements discussed in *Crawford*. *See Crawford*, 541 U.S. at 51. We must ask whether A.W.'s interview with Dr. Harre was the "functional equivalent" of ex parte in-court testimony? *See id.* I find it telling that Dr. Harre took pains at the start of her questioning to establish A.W. knew the importance of telling the truth—a hallmark of creating reliable "testimony." And while Dr. Harre's questions did not come directly from the police, as was the case in *Bentley*, involvement with law enforcement and the prosecution stood as bookends to the work of the CRPC. The family's first stop was the police station; the trip to the emergency room and later to Dr. Harre's center served as evidence-gathering for the police. Then Dr. Harre's report was ultimately sent to the county attorney with gratitude for being part of the "assessment" process.

---

[7] After *Bentley* and *Harper* were decided, the United States Supreme Court further refined the definition of testimonial statements in *Michigan v. Bryant*, 131 S. Ct. 1143, 1160 (2011). The *Bryant* majority held the "primary purpose" inquiry from *Davis* was an objective test, and depended on the circumstances surrounding the interview rather than the subjective intent of the participants. *Id.* The majority allowed that "the statements and actions of both the declarant and interrogators provide objective evidence of the primary purpose of the interrogation." *Id.* The majority also explained that while formality was not the "sole touchstone" of the primary purpose inquiry, formality suggested "the absence of an emergency and therefore an increased likelihood that the purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Id.*

When addressing confrontation clause challenges involving children's statements to medical professionals, courts from other jurisdictions have considered whether the professionals were essentially acting in a law enforcement capacity. *E.g.*, *compare United States v. Squire*, 72 M.J. 285, 288 (C.A.A.F. 2013) (holding pediatrician was not acting as law enforcement when he conducted sexual assault exam of eight-year-old alleged victim when pediatrician's only connection to law enforcement was role as a mandatory reporter) *with United States v. Gardinier*, 65 M.J. 60, 65 (C.A.A.F. 2007) (holding child's statements made to a sexual assault nurse examiner were testimonial because the sheriff's office was involved in arranging the interview and the nurse's report was sent to law enforcement).

When the interview serves a dual role—obtaining information for a medical exam and preserving the child's account for a possible future prosecution—at least one court has determined the primary purpose from the content and circumstances of the child's statements. *See State ex rel. Juvenile Dep't of Multnomah Cnty. v. S.P.*, 215 P.3d 847, 866 (Or. 2009). When faced with a question very similar to the one before us today, the Oregon Supreme Court held the child's statements to a pediatrician and social worker at CARES, a child abuse response program, were testimonial as the child identified a particular youth as his abuser and described the occurrence and extent of the abuse. *Id.* The court reasoned:

> Obviously, no witness goes into court to seek medical treatment. But witnesses do go into court to describe past sexual misconduct, and that is exactly what N did at CARES. N made his statements in a formal setting, in response to structured questions

about past events with potential serious consequences for [S.P.]. From a functional standpoint, N's examination was similar to the *ex parte* examinations condemned in *Crawford.* N acted as a witness; he bore testimony against [S.P.]. . . . [W]e acknowledge that N's evaluation served two purposes. CARES sought to produce statements that it could use against [S.P.] in this proceeding, and it also sought to determine the extent of N's abuse in order to recommend treatment. Those are laudable goals, but they do not change the fact that CARES conducts the sort of *ex parte* examinations that trigger the right secured by the Confrontation Clause.

*Id.* at 864–65.

I find the Oregon court's analysis to be persuasive under the existing case law. Unless and until we receive different guidance on the Confrontation Clause from the United States Supreme Court or our own supreme court, I believe under *Crawford* and *Bentley*, A.W.'s statements were the equivalent of in-court testimony. Because J.C.'s attorney did not have an opportunity to cross examine her, I would reverse and remand for a new adjudication hearing without the improper evidence from Mattox and Dr. Harre.