No. 614 November 29, 2023 279

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

BRIAN JOSEPH MANN,
*Defendant-Appellant.*

Marion County Circuit Court
17CR55426; A175263

Courtland Geyer, Judge.

Argued and submitted December 20, 2022.

Anne Fujita Munsey, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Greg Rios, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Ortega, Presiding Judge, and Powers, Judge, and Hellman, Judge.

HELLMAN, J.

Restitution award to Willamette Valley reversed; otherwise affirmed.

**HELLMAN, J.**

Defendant pleaded guilty to and was convicted of two counts of attempted first-degree sexual abuse for acts committed against a child. In addition to supervised probation and compensatory fines, the trial court awarded restitution in the amount of $4,400 to Willamette Valley Community Health (Willamette Valley), the organization that paid for a sexual abuse evaluation of the child at Liberty House, a child abuse assessment center. That award of restitution to Willamette Valley is the subject of defendant's appeal. The central question before us is whether Willamette Valley "suffered economic damages as a result of the defendant's criminal activities" when it paid Liberty House for the evaluation, such that Willamette Valley qualifies as a "victim" entitled to receive restitution under ORS 137.103(4)(b).[1] As explained below, we conclude that the state failed to establish that Willamette Valley suffered economic damages within the meaning of the statute. Specifically, the state failed to identify any theory of civil recovery that would allow Willamette Valley to recover from defendant the cost of the forensic interview conducted at Liberty House—an interview that occurred after a referral by police, was at least partly for investigatory purposes, and for which neither the victim nor the victim's family would ever be billed. We therefore reverse the trial court's restitution award.

## BACKGROUND

This is the second time this case has been before us on the question of restitution to Willamette Valley, and the state's theory of recovery and the statutory basis for the trial court's award of the costs of the Liberty House evaluation have shifted throughout the litigation—primarily because of intervening case law. We begin with a brief overview of that litigation history, which frames the specific question that now arises in this second appeal.

---

[1] Statutory citations throughout this opinion are to the statues in place as of July 2017. Although there have been some amendments to the applicable statutes between 2015 and 2020, those amendments are not relevant to the legal analysis in this opinion. We note that despite statutory changes over the lifespan of this case, neither party indicated which version of the statute they relied on, nor did they made an argument that a specific version of the statute was critical to answering the legal questions before us.

The state initially sought an award of restitution to Willamette Valley on the ground that it was *an insurance carrier* that had expended money on behalf of a victim. *See* ORS 137.103(4)(d) (defining a "victim" for restitution purposes to include "an insurance carrier, if it has expended moneys on behalf of a victim described in paragraph (a) of this subsection"); ORS 137.104(4)(a) (defining "victim" to include the person against whom the defendant committed the offense if the court determines that the person suffered economic damages as a result). In support of that request, the state offered testimony from two witnesses: Allison Kelley, the chief executive officer of Liberty House, and Sarah Zumwalt, an employee of Willamette Valley.

Kelley's testimony focused on the nature of the services provided by Liberty House and its billing practices. With regard to the services, Kelley testified that Liberty House is a child abuse assessment center that is "a specialty medical clinic that provides what we would call a trauma informed response to concerns of child abuse, neglect, trafficking, that kind of thing." She testified that their staff is trained to conduct "forensic interviews," the purpose of which is to "create an environment in which a child feels safe enough to describe what his or her experiences have been." According to Kelley, the interview is "like an extended social history" that is an "absolutely necessary [tool] to determine first the diagnosis and then what the follow-up recommendations might be." She repeatedly rejected the characterization of the interview as having an investigatory purpose and asserted that the purpose was to "[get] a complete history for the medical provider."

At the same time, Kelley acknowledged that Liberty House works with law enforcement. She explained that "there are statutes [in ORS chapter 418] that say that when there are those other agencies involved they are allowed to work together. And they should be able to work together because it makes it easier for the child." She testified that the ultimate report "is able to be shared for the purposes of the statute—what the statutes provide in responding to child abuse." Copies of the assessment are sent to agency partners, including the Department of Human Services

(DHS) and a law enforcement agency, if they are involved. This was one of those cases in which law enforcement was involved; the report stated that the referral to Liberty House came from an officer in the Aumsville Police Department.

Kelley also testified about the costs associated with a Liberty House interview and the center's funding model. She explained that Liberty House is a nonprofit and that 14 percent of its overall budget comes from state grants, including the "Child Abuse Multidisciplinary Intervention Grant," that is contemplated under ORS 418.747—one of the statutes that addresses the relationship between agencies. The rest of the budget, Kelley explained, "comes from fundraising that we have to do and billing that we have to do."

With regard to billing, Kelley testified that children and their parents are not themselves billed for an assessment by Liberty House. She explained that, when a child goes through the intake process, Liberty House asks the child's parent or caregiver whether they have insurance and would be willing to allow Liberty House to bill that insurance company. However, if the child's parents or caregiver do not have insurance or are unwilling to allow Liberty House to bill the insurance company, then Liberty House will "take a loss." Kelley testified:

> "[I]n that case there are—there will be no way to recover the cost. *We never bill a child or a family. We don't bill a copay. We don't bill a deductible and we don't bill the family directly. They are not responsible in any way for the costs associated with that visit.*"

She later reiterated that the victim's parents would not have signed anything other than a consent to treatment:

> "Q.   Okay. Did the parents sign any kind of fee agreement or subrogation agreement?
>
> "A.   No, they would not have because we never bill the parent.
>
> "Q.   And as a result you never billed the victim as well.
>
> "A.   We never bill the victim."

Kelley then described the relationship between Liberty House, Willamette Valley, and the victim in this

case. She explained that, because the victim was eligible to receive Medicaid healthcare through the Oregon Health Plan (OHP), and was enrolled with Willamette Valley, Willamette Valley was the "conduit" for the payment and was the "insurer of record for children who are eligible and enrolled in that coordinated care organization." She explained that Liberty House's agreement with Willamette Valley allows Liberty House to "bill and they reimburse on a voluntary basis because of our agreement at the rates that are reflected."

Zumwalt, a Willamette Valley employee, testified about the nature of Willamette Valley and its relationship to Liberty House. Zumwalt testified that Willamette Valley is a "coordinated care organization" that "manage[s] the Medicaid benefits for Marion County." She testified that the "claims paid by Willamette Valley Community Health totaled $4,400[,]" broken down by medical codes that had been coded by Liberty House. The state's exhibits reflected those codes and included the following itemized entries: "Office/Outpatient Visit New" ($2,400); "PROLONG E&M/PSYCTX SERV O/P" ($500); "PROLONG E&M/PSYCTX SERV O/P" ($500); "TEAM CONF W/PAT BY HC PROF" ($1,000). Zumwalt testified that, under those codes, the initial consult is $2,400 and that there are additional amounts that can be billed under other codes when the appointments run longer; she also explained that a final $1,000 charge was for "a team conference with the patient or family by the health care professional."

After hearing the evidence and arguments at that initial hearing, the trial court agreed with the state's view that Willamette Valley was entitled to restitution as an insurance company. The court explained that a victim as defined by ORS 137.103(4) includes not only the person against whom the crime was committed but also "an insurance carrier if it has expended monies on behalf of a victim," and that "Willamette Valley Community Health is[,] according to [Liberty House's CEO], the insurer of record in this case."

Defendant appealed the ensuing judgment that awarded restitution and argued, among other contentions,

that Liberty House does not bill children or their families for the cost of an evaluation, meaning that Willamette Valley had not expended money "on behalf of a victim described in paragraph (a)." By the time the state filed its answering brief, the law had evolved significantly with regard to the definition of "victim" under ORS 137.103(4). In *State v. Moreno-Hernandez*, 365 Or 175, 189, 442 P3d 1092 (2019), the court held that medical expenses of an unemancipated minor child were economic damages suffered by the child's parent, not the child, meaning that the child was not a "victim" within the meaning of ORS 137.103(4)(a). Then, in *State v. White*, 299 Or App 165, 449 P3d 924 (2019) (*T. White*), we applied that reasoning in the context of a restitution award to an insurer under ORS 137.103(4)(d). We reversed the award because the minor victim had not suffered economic damages and, therefore, moneys expended on the child's behalf were not expended "'on behalf of a victim described in paragraph (a) of this subsection.'" *Id.* at 168 (quoting ORS 137.103(4)(d)).

After those developments in the law, the state did not defend the notion that Willamette Valley could recover as an insurance carrier under paragraph (d) of the statute. Instead, the state recast Willamette Valley's role, arguing that it was not an insurance carrier at all; the state argued instead that Willamette Valley was entitled to claim restitution under a different paragraph, ORS 137.103(4)(b), which defines a victim as "[a]ny person not described in paragraph (a) of this subsection whom the court determines has suffered economic damages as a result of the defendant's criminal activities."

We ultimately reversed the restitution award, concluding that the case was not materially distinguishable from *T. White*. *State v. Mann*, 306 Or App 130, 131, 471 P3d 826 (2020). We declined to address the merits of the state's newly developed theory that Willamette Valley could recover under paragraph (b), mainly because we were not convinced that the record would have been the same had the state raised its alternative theory below. *Id.* We therefore left it to the trial court on remand to "consider whether there are 'other permissible options,' including the option proposed by

the state, for awarding restitution to Willamette Valley." *Id.* (quoting *T. White*, 299 Or App at 169).

On remand, the state again proposed its alternative option for awarding restitution to Willamette Valley under ORS 137.103(4)(b). And despite what we said in the earlier appeal about the record developing differently with regard to that argument, both sides elected to proceed on the record that had been developed at the earlier restitution hearing. The state offered the transcript of the earlier hearing and advanced its new legal argument based on the existing record.

The state's new argument went as follows: Testimony at the original restitution hearing established that Willamette Valley is a "coordinated care organization" that administers the OHP to children within Marion County and Polk County who are eligible to receive both benefits. Willamette Valley incurred the cost of the evaluation as a provider of OHP benefits. Because the benefits are provided under the OHP or Medicare to families that qualify, Willamette Valley does not enter into contractual agreements that result in it being an insurance carrier. And because it is not an insurance carrier, the reasoning in *T. White* with regard to paragraph (d) is inapplicable. Therefore, Willamette Valley is entitled to recoup the cost of the evaluation under paragraph (b), which allows recovery by "[a]ny person not described in paragraph (a) of this subsection whom the court determines has suffered economic damages as a result of the defendant's criminal activities."

The trial court agreed with the state that it was authorized to award restitution to Willamette Valley under ORS 137.103(4)(b). The court reasoned that the $4,400 "is an expense that was incurred as part of the criminal activity"; that the cost of the evaluation was "a medical expense and was not investigatory in nature"; that it was Willamette Valley, not the victim or the victim's family, "who has suffered these economic damages"; and that the arrangement between Willamette Valley and Liberty House, although not addressed "in the fairly extensive list of persons, organizations and circumstances who could be compensated as a victim under ORS 137.103(4)," nonetheless fell "under the

broader category (b) cited by the State." Thus, the trial court entered a judgment that reimposed the same $4,400 in restitution to Willamette Valley. Defendant timely appealed that judgment.

## DISCUSSION

Defendant's primary argument on appeal is straightforward: For the state to establish that Willamette Valley is a victim entitled to restitution under ORS 137.103(4)(b), the state must show that Willamette Valley suffered "economic damages," which means "objectively verifiable monetary losses including but not limited to reasonable charges necessarily incurred for medical, hospital, nursing and rehabilitative services and other health care services, burial and memorial expenses * * *." ORS 31.710(2)(a). That requires the state to identify some theory by which the amount sought as restitution "'could be recovered against the defendant in a civil action arising out of the facts or events constituting defendant's criminal activities.'" *State v. Ixcolin-Otzoy*, 288 Or App 103, 105, 406 P3d 100 (2017), *rev den*, 362 Or 699 (2018) (quoting *State v. Dillon*, 292 Or 172, 182, 637 P2d 602 (1981)); *see State v. White*, 296 Or App 445, 451, 439 P3d 569, *rev den*, 365 Or 195 (2019) (*J. White*) ("[P]aragraph (b) of the statute requires the state to articulate a theory by which defendant would have civil liability directly to CARES itself."); *see also State v. Fox*, 370 Or 456, 468-69, 521 P3d 151 (2022) ("[*State v. Ramos*, 358 Or 581, 368 P3d 446 (2016)] instructs that, in using [the term 'economic damages'], the legislature did not intend to differentiate between the 'economic damages' that a victim can recover as damages in a civil action and those that the victim can recover as restitution in a criminal case."). According to defendant, the state has never explained the theory by which Willamette Valley could recover its expenditures in a civil action against defendant.

The state accepts defendant's framing of the question but argues that it did, in fact, identify a viable theory of civil recovery for purposes of ORS 137.103(4)(b). That theory, as described by the state on appeal, is that a coordinated care organization like Willamette Valley has, "by operation of law, assignment rights to any civil cause of action

that the victim's parents would have against defendant."
The state's theory rests on two premises: (1) that the victim's parents would have had a civil cause of action against
defendant for the costs of the Liberty House evaluation; and
(2) that Willamette Valley would have been able to assert
those rights by operation of law to recover in a civil action.
Because the first premise of the state's contention is unsupported by this record, we need not address the second.[2]

 The first premise of the state's argument is that the
"minor victim's parents would have a remedy by civil action
for assault or battery on the child's behalf," citing *State v.
Haines*, 238 Or App 431, 436 n 3, 242 P3d 705 (2010), and
*Palmore v. Kirkman Laboratories, Inc.*, 270 Or 294, 307, 527
P2d 391 (1974) (explaining that a child's parent is "the real
party in interest as to [a child's] claim for medical expenses"
in a tort action). The state acknowledges that the parents
have not suffered any "out-of-pocket loss" because Liberty
House does not bill children or parents for the cost of the
evaluation. But, the state quotes *White v. Jubitz Corp.*, 347
Or 212, 234, 219 P3d 566 (2009) (*Jubitz Corp.*), for the proposition that the parents' lack of out-of-pocket loss does not
preclude recovery because an injured plaintiff suffers "economic damages" by incurring medical expenses even if "a
third party satisfies medical charges" and the plaintiff has
no obligation to repay the third party. The state also cites
our decision in *State v. Romero-Navarro*, 224 Or App 25, 29,
197 P3d 30 (2008), *rev den*, 348 Or 13 (2010), issued before
the Supreme Court's decision in *Jubitz Corp.*, in which
we explained that expenses are "incurred" when a victim
becomes "subject to" the expenses even though someone else
might pay them.

 The problem for the state is that we have since held
that, in the absence of a bill from a provider or other evidence
that a parent or child would be responsible for payment of
a child abuse evaluation, there is insufficient evidence from
which to infer that the child or family is "subject to" the

---

[2] Although we do not reach the merits of the state's second premise, we note
that the state does not explain, and it is not readily apparent, how the statutes
and rules that it cites, which refer to an assignment to "the state" or an assignment "to the Authority," would operate to assign any rights to Willamette Valley,
a coordinated care organization.

expenses for purposes of obtaining restitution. In *State v. Herfurth*, 283 Or App 149, 154, 388 P3d 1104 (2016), *rev den*, 361 Or 350 (2017), we considered whether the expenses of a child abuse evaluation conducted by CARES, an abuse assessment center, could be recovered as economic damages. We explained that, for purposes of the restitution statutes, "economic damages" are objectively verifiable out-of-pocket losses that a person could recover against the defendant in a civil action arising out of the defendant's criminal activities. *Id.* at 158. We thus concluded that the state had failed to establish that the minor victim or her family were in any way "subject to" the cost of the abuse evaluation:

> "The record in this case regarding the CARES costs is sparse. It does not contain a bill from CARES, and the bills that it does contain do not reflect any charges or payments that correspond to the [Criminal Injuries Compensation] Account's request for restitution for the CARES costs. The bills do not indicate that MD (or her family, because she was a minor) was charged for the CARES evaluation. And, there is no other evidence in the record that MD or her family was responsible for payment of the CARES evaluation, which, as the state acknowledged, was conducted as part of its criminal investigation. For example, the record does not contain any evidence of any payment agreements or actual payments by MD or her family relating to the CARES evaluation that would support a nonspeculative inference that MD or her family had subjected themselves to financial liability for the evaluation. Therefore, the record does not contain legally sufficient evidence to give rise to a theory of civil liability under which the CARES costs could be recovered from defendant."

*Id.* at 158-59 (footnote omitted).

The state does not address *Herfuth*, let alone attempt to distinguish it. Nor does there appear to be any meaningful distinction between the records in the two cases with regard to whether the victim's families were "subject to" expenses for the child abuse evaluations. Here, if anything, the record affirmatively establishes that the victim's parents would not have been subject to any expenses as a result of the Liberty House evaluation. Kelley, Liberty House's CEO, testified that "[w]e never bill a child or a family. We don't bill a copay. We don't bill a deductible and we don't

bill the family directly. They are not responsible in any way for the costs associated with that visit." She later reiterated that the parents did not sign "any kind of fee agreement or subrogation agreement" because "we never bill the parent" and "[w]e never bill the victim."

Thus, on this record, the first premise of the state's argument fails under *Herfurth*, because the record is legally insufficient to establish that the victim's parents "incurred" any medical expenses—*i.e.*, were liable for or subject to any medical expenses related to the child abuse evaluation. 283 Or App at 158-59.

We recognize that, more recently, the Supreme Court in *Moreno-Hernandez* was presented with an argument based on *Jubitz Corp.* that is similar to the one that the state raises here: "that medical expenses can be incurred based on treatment received, even where there is no obligation to pay, and that therefore [the minor] incurred medical expenses regardless of whether she paid for or was liable for the cost of her treatment." 365 Or at 183. After an extensive discussion of the parties' competing interpretations of *Jubitz Corp.* on that question, the Supreme Court ultimately did not decide whether medical expenses can be incurred based on treatment received, even where there is no legal obligation to pay. Instead, the court decided that it was "faced with a more straightforward question: Whether [*Jubitz Corp.*] supplanted the common law rule that when a child is injured, and receives treatment for that injury in her minority, it is the parent who suffers any economic damages based on medical expenses." *Id.* at 186. Because the Supreme Court elected not to address whether expenses are incurred based upon treatment received rather than a bill, nothing in that decision calls into question our holding in *Herfurth*. Thus, even if there may be an open question under Supreme Court jurisprudence with regard to the interpretation and application of the rule in *Jubitz Corp.*, the question is settled under *Herfurth* when it comes to a child abuse evaluation: There must be some evidence that the child's parents were "subject to" the cost of the evaluation, beyond the mere fact that the services were rendered.

*Herfurth*, however, is not the state's only obstacle on this record. Even if the state's reading of *Jubitz Corp.* were

correct and costs for medical services can be incurred in the absence of a billing arrangement, it is the state's burden to put forth a viable theory of civil recovery for the cost of the specific services that were rendered. As discussed further below, the services in this case involved an interview following a police referral to Liberty House, which had an investigatory purpose in addition to any medical purpose, and was conducted by an abuse assessment center that receives public funding for conducting the assessment according to protocols developed by law enforcement. The state has not offered any supporting authority or a persuasive explanation as to what principles of civil law would allow a person to recover the costs of services that are the product of a referral by police, at a facility partially funded in that manner, and that, by design, are never actually billed to the person or the person's family.

As Kelley described in her testimony, Liberty House operates within a statutory framework that addresses child abuse assessment and intervention. ORS chapter 418 creates and implements the Child Abuse Multidisciplinary Intervention (CAMI) Program. *See* ORS 418.746 to ORS 418.800. The CAMI program is part of the Department of Justice (DOJ), and it serves the following purposes listed under ORS 418.783(1):

"(a)   Establish and maintain a coordinated multidisciplinary community-based system for responding to allegations of child abuse that is sensitive to the needs of children;

"(b)   Ensure the safety and health of children who are victims of child abuse to the greatest extent possible; and

"(c)   Administer the grant programs established under ORS 418.746 and 418.786."

The "grant programs established under ORS 418.746" exist to fund, from money appropriated to the DOJ, multidisciplinary teams (MDTs) at the county level. Those teams can include a "community assessment center." ORS 418.746(1), (2), (5). ORS 418.747, in turn, describes the requirements of those MDTs. Subsection (1) provides that the district attorney of each county is responsible for developing those teams and that they shall consist of:

"law enforcement personnel, Department of Human Services child protective service workers, school officials, county health department personnel, county mental health department personnel who have experience with children and family mental health issues, child abuse intervention center workers, if available, and juvenile department representatives, as well as others specially trained in child abuse, child sexual abuse and rape of children investigation."

ORS 418.747(1). Subsection (2) requires the teams to develop a written protocol "for immediate investigation of and notification procedures for child abuse cases *and for interviewing child abuse victims*," and subsection (3) requires that team members, including personnel who conduct interviews of child abuse victims, "shall be trained in risk assessment, dynamics of child abuse, child sexual abuse and rape of children and legally sound *and age appropriate interview and investigatory techniques*." ORS 418.747(2), (3) (emphases added).

In *State ex rel Juv. Dept. v. S. P.*, 346 Or 592, 616, 215 P3d 847 (2009), the Supreme Court discussed parts of that scheme in the context of an argument that statements made by a three-year-old child to staff members at an abuse assessment center were testimonial for purposes of the Sixth Amendment to the United States Constitution. Among other things, the court observed:

"[The abuse assessment center, CARES,] partners with local police and the district attorney's office. Its members are trained in interview and investigatory techniques that are, among other things, 'legally sound.' [ORS 418.747(2) (2007)] suggests that CARES' protocol for interviewing child abuse victims was developed by 'teams,' *i.e.*, the local MDT in which CARES is a partner. In other words, that statute provides an opportunity for the district attorney's office and the police to participate in the development of the protocol that CARES uses to interview the victims of child abuse."

*Id.* at 618-19. The court further observed that funding of the assessment centers is conditioned upon the training of workers in those "legally sound" interview techniques. *Id.* at 620 (citing ORS 418.747(3) (2007), *amended by* Or Laws

2015, ch 736, § 63; Or Laws 2017, ch 356, § 40; and Or Laws 2019, ch 141, § 17).

In light of those factors, as well as a fiscal report filed in 2008 with CAMI and evidence in the record in that case about the relationship between CARES and law enforcement, the court in *S. P.* described the abuse assessment center as a "proxy" for the police interview:

> "Service as a proxy for the police appears to be a primary function of CARES. CARES receives a significant amount of its funding from the Department of Justice. As a condition of receiving those funds, CARES must train its workers in 'legally sound' interview techniques. [ORS 418.747(3) (2007)]. *** As [a social worker] stated in his testimony, a goal of CARES is to 'centralize' the process of interviewing child abuse victims and allow 'law enforcement and DHS' to be 'present to hear firsthand what the child says,' so that they do not need to 'reinterview the child themselves.' In other words, an interview by CARES staff acts as a *substitute* for an interview with the police. In addition, CARES receives reports on the outcomes of child abuse cases in which it has evaluated the victim so that it may reassess its evaluation techniques in order to strengthen the prosecution's case. In light of all of those facts, we conclude that, when [the physician] and [social worker] interviewed N, they were acting as proxies for the police."

346 Or at 620.

Defendant, seizing on that relationship between law enforcement and abuse assessment centers, argues that a separate statute, ORS 161.665, prohibits the recovery of the cost of a child abuse assessment. That statute provides:

> "(1)   Except as provided in ORS 151.505, the court, only in the case of a defendant for whom it enters a judgment of conviction, may include in its sentence thereunder a money award for all costs specially incurred by the state in prosecuting the defendant. ***. *Costs do not include expenses inherent in providing a constitutionally guaranteed jury trial or expenditures in connection with the maintenance and operation of government agencies that must be made by the public irrespective of specific violations of law.*"

(Emphasis added.)

In defendant's view, "Liberty House provides services under the authority of the Department of Justice and county district attorneys[,]" such that the cost of a Liberty House evaluation is "an expenditure made in connection with the maintenance and operation of government agencies that must be made by the public irrespective of specific violations of law under ORS 161.665, just like regular police services, even if it also entails providing medical services to then-suspected victims."

By its terms, ORS 137.103 refers to restitution as opposed to awarding "costs." Nonetheless, we have previously discussed the restitution statutes and ORS 161.665 together, suggesting that investigatory costs under ORS 161.665 are not recoverable as restitution. In *State v. Wilson*, 193 Or App 506, 509, 92 P3d 729 (2004), the state sought and was awarded restitution payable to the Fugitive Apprehension Unit of the Department of Corrections (FAU) in the amount of $5,000 for its labor expenses associated with tracking and apprehending the defendant. We reversed the award, explaining that the labor costs incident to the FAU were incurred by that government entity irrespective of specific violations of law: "Such expenses, which are incurred irrespective of specific violations of law, are no more recoverable as restitution than they are recoverable as costs under ORS 161.665." *Id.* at 510-11 (emphasis added). But we then returned to the framework of the restitution statute in the next sentence, concluding: "Because the expenses at issue are not recoverable under any theory of civil liability, the trial court lacked authority to impose restitution." *Id.* at 511.

Here, the threshold question is not whether ORS 161.665 *precludes* recovery of the cost of the evaluation but whether the state has affirmatively shown that they are economic damages to the child's parents—as opposed to some other type of cost, such as the cost of a governmental service that is provided and subsidized as a matter of statewide policy. The state has not carried that burden.[3]

---

[3] Because we focus on whether the state carried its burden to demonstrate a theory of civil recovery for purposes of the restitution statute, as opposed to the construction of ORS 161.665, we do not address whether defendant sufficiently preserved his standalone contention under ORS 161.665.

In this case, the record does not reflect that Liberty House receives as much of its funding from the DOJ as CARES had in *S. P.*, where the court described CARES as a proxy for law enforcement. 346 Or at 620. Nonetheless, the evidence in the record is that 14 percent of Liberty House's funding comes from DOJ and, as the court observed in *S. P.*, that funding is contingent upon Liberty House conducting its interviews according to a protocol developed with the participation of the district attorney's office and police.

Given the statutory overlay and contingent funding to abuse assessment centers like Liberty House, an interview conducted there based on referral by police has, at the very least, a dual purpose of providing medical care and assisting police in investigating a possible criminal case under the CAMI scheme. That is true regardless of the subjective intent of the medical providers. Although Kelley testified that the purpose of the interview is to obtain a complete medical history, and that the agencies have "complete and separate independent functions," the fact remains that Liberty House receives funding for conducting those interviews according to a protocol developed with the input of district attorneys and police, and the results of that interview are shared with police.

In theory, it is possible that parts of an assessment by Liberty House would have no investigatory component and be purely directed at treatment of the child. However, none of the exhibits or testimony in this case allow for that type of differentiation. The $4,400 requested and awarded in this case appears to be primarily for the interview time, and none of the entries are specific as to whether they were directed at treatment of the child as opposed to determining whether abuse occurred.

Again, the state has not explained how those undifferentiated costs of a child abuse assessment are recoverable. The CAMI scheme represents a policy decision to devote public funding to coordinate a community response to allegations of child abuse. However, neither that scheme nor the restitution statutes reflect a further policy choice to shift those undifferentiated expenses to criminal defendants in

all cases, regardless of whether a victim or victim's family has paid or been subject to the cost of the abuse assessment.

Nor does there appear to be any support for that idea in related statutes addressing victim compensation. After the CAMI statutory scheme was enacted in 1989, *see* Or Laws 1989, ch 998, the legislature built on that scheme and connected it with others over the years—including statutes concerning payment for the abuse assessments. In 1997, the legislature enacted ORS 147.390 as part of a bill that also amended the CAMI scheme. *See* Or Laws 1997, ch 872, § 25. At the time of the Liberty House evaluation in this case, ORS 147.390 provided:

"(1)  Notwithstanding that a child is not a victim under ORS 147.015 (1)(a), in cases of suspected child sexual abuse as described in ORS 419B.005 (1)(a)(C), (D) or (E), or child physical abuse by an adult or caretaker as otherwise described in ORS 419B.005 (1)(a)(A), compensation may be made on behalf of the child for a child abuse medical assessment as defined in ORS 418.782 *** if:

"(a)  The expenses are actually paid or incurred by the applicant; and

"(b)  A claim is filed on behalf of the child in the manner provided in ORS 147.015.

"(2)  The Department of Justice may pay compensation for child abuse medical assessments *** regardless of whether a finding of abuse is made and only if other insurance is unavailable. If the department pays compensation, the department shall pay the compensation directly to the provider of the services. The medical fee schedules for payment under this section shall be the schedules adopted under ORS 147.035."

The phrase "actually paid or incurred by the applicant" runs counter to the notion that victims are to be compensated even if they have not actually paid or are not actually liable or subject to the expenses; and, the scheme contemplates that DOJ can directly pay medical providers for the services without any involvement from the child or child's family.

For all of those reasons, even assuming that it would be permissible for the state to shift the full costs of abuse

evaluations to criminal defendants in all circumstances,[4] the state has not identified any clear statutory basis for that cost-shifting, as is evident from its multiple attempts to fit those costs into different definitions of "victim" in ORS 137.103(4).

In sum, the state has not explained, below or on appeal, how a medical evaluation that is part of this type of scheme—a scheme in which the DOJ funds the abuse assessment centers contingent upon the use of certain protocols, and can pay providers directly for child abuse medical assessments, and can compensate the victim for expenses that are "actually paid or incurred by the applicant"—would be recoverable by a child or the child's family, regardless of whether they were ever subject to or liable for the cost of the assessment. Moreover, the state has already had multiple opportunities below and on appeal to articulate a theory of restitution, has rested on the same evidentiary record at each point, and has not identified any alternative basis for an award of restitution to Willamette Valley for the cost of the evaluation. We therefore reverse the restitution award outright rather than remand in this circumstance.

Restitution award to Willamette Valley reversed; otherwise affirmed.

---

[4] Defendant alternatively contends that recovery of the costs of the evaluation only upon conviction creates an incentive for conviction that violates due process. We need not and do not reach that argument, which does not appear to have been raised to the trial court at the original hearing or during the proceedings on remand.